No. 23-16083

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

BRIAN NETZEL, *et al*,

*Plaintiffs - Appellants*,

*v.*

AMERICAN EXPRESS COMPANY,

*Defendant - Appellee.*

---

Appeal from the United States District Court
for the District of Arizona
No. 2:22-cv-01423-SMB
The Honorable Susan M. Brnovich

---

## BRIEF OF APPELLANTS

---

David Pivtorak (CA Bar No. 255943)
THE PIVTORAK LAW FIRM
611 Wilshire Boulevard, Suite 911
Los Angeles, CA 90017
Telephone: (213) 291-9130
Facsimile:  (877) 748-4529
david@piv4law.com

Aaron T. Martin (AZ Bar No. 028358)
MARTIN LAW & MEDIATION PLLC
2415 East Camelback, Suite 700
Phoenix, AZ 85016
Telephone: (602) 812-2680
Facsimile: (602) 508-6099
aaron@martinlawandmediation.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ........................................................................1

II.  JURISDICTIONAL STATEMENT .........................................3

III.  STATUTORY AUTHORITIES ...............................................4

IV.  ISSUES PRESENTED ............................................................4

V.  STATEMENT OF THE CASE AND FACTS ..........................5

    A.  AmEx Institutes Racial Engineering Policies for Its Employees and Customers ....................................................5

    B.  Plaintiffs Experience Differential Treatment or Explicit Hostility From AmEx Management Because of Their Race ...............6

    C.  Plaintiffs File Suit to Enjoin AmEx's Discrimination ........................10

VI.  SUMMARY OF ARGUMENT ...............................................12

VII.  STANDARD OF REVIEW ....................................................17

VIII.  ARGUMENT ........................................................................17

    A.  AmEx's Arbitration Agreement Must Be Interpreted Under California Law ....................................................17

        1.  The "Individual Claims Only" clause bars Plaintiffs from seeking public injunctive relief in any forum ...........................17

        2.  California has a materially greater interest than New York in determining whether AmEx can prohibit Plaintiffs from seeking a public injunction ...............................18

    B.  Plaintiffs Seek Public Injunctive Relief ............................................21

        1.  AmEx's discriminatory policies harm the general public ........24

    C.  The District Court Erred by Failing to Analyze the Choice of Law on a Plaintiff-by-Plaintiff Basis .................................................26

iii

1.    Larson's employment with AmEx was tied exclusively to
      California ...................................................................................27

2.    California featured heavily in Netzel's work............................29

3.    The subject matter of Smith's employment was also
      significantly related to California .............................................30

D.    AmEx's Poison Pill Provision Invalidates the Agreement in Its
      Entirety ...........................................................................................31

E.    The District Court Erred in Holding the Agreement is Not
      Procedurally Unconscionable.............................................................32

1.    California law governs the interpretation of the
      Agreement for Netzel and Smith ...............................................32

2.    The Agreement is procedurally unconscionable even
      under New York law ...................................................................36

F.    The Agreement is Substantively Unconscionable ..............................39

1.    The Agreement is illusory because it allows AmEx to
      unilaterally change its terms .......................................................40

2.    AmEx gives itself the exclusive right to avoid
      adjudication of claims in *any* forum ..........................................41

3.    The confidentiality clause heavily favors AmEx......................43

4.    The Agreement is permeated with illegality and cannot
      be enforced ..................................................................................45

IX.   **CONCLUSION** ..........................................................................................46

CERTIFICATE OF COMPLIANCE..............................................................47

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adkins v. Comcast Corporation*,
    2018 WL 4846548 (N.D. Cal. 2018) ....................................................... 18

*Ali v. Daylight Transp., LLC*,
    59 Cal.App.5th 462 (2020) ...................................................................... 40

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
    24 Cal.4th 83 (2000) .......................................................................... 39, 44

*Barba v. Seung Heun Lee*,
    2010 WL 11515658 (D. Ariz. 2010) ........................................... 13, 15, 26

*Baxter v. Genworth North Am. Corp.*,
    16 Cal.App.5th 713 (2017) ...................................................................... 40

*Blair v. Rent-A-Center, Inc.*,
    928 F.3d 819 (9th Cir. 2019) ................................................. 18, 20, 22, 23,

*Brennan v. Bally Total Fitness*,
    198 F.Supp.2d 377 (S.D.N.Y. 2002) ................................. 36, 37, 38, 39, 40

*Bushley v. Credit Suisse First Boston*,
    360 F.3d 1149 (9th Cir. 2004) ................................................................. 17

*Cabatit v. Sunnova Energy Corp.*,
    60 Cal.App.5th 317 (2020) ...................................................................... 33

*CACI Premier Tech., Inc. v. Faraci*,
    464 F.Supp.2d 527 (E.D. Va. 2006) ........................................................ 43

*Davis v. Advanced Care Technologies, Inc.*,
    2007 WL 2288298 (E.D. Cal. 2007) ........................................................ 28

*de Souza Silva v. Pioneer Janitorial Servs., Inc.*,
    777 F.Supp.2d 198 (D. Mass. 2011) ........................................................ 43

*Di Genova v. State Bd. of Ed.*,
    57 Cal.2d 167 (1962) ................................................................ 24

*Doctor's Assocs., Inc. v. Casarotto*,
    517 U.S. 681 (1996).................................................................. 32

*Douglas v. U.S. Dist. Court for Cent. Dist. of California*,
    495 F.3d 1062 (9th Cir. 2007) ................................................... 32

*Drake v. Hyundai Rotem USA, Corp.*,
    2013 WL 4551228 (E.D. Pa. 2013) ........................................... 42

*Heart of Atlanta Motel, Inc. v. U. S.*,
    379 U.S. 241 (1964).................................................................. 26

*Hodges v. Comcast Cable Communications, LLC*,
    21 F.4th 535 (9th Cir. 2021) ............................................... 22, 23

*Hope v. Early Warning Services LLC*,
    2023 WL 5505020 (C.D. Cal. 2023) ......................................... 20

*Ingenco Holdings, LLC v. Ace Am. Ins. Co.*,
    921 F.3d 803 (9th Cir. 2019) .............................................. 27, 30

*Johnmohammadi v. Bloomingdale's, Inc.*,
    755 F.3d 1072 (9th Cir. 2014) ..................................................... 3

*Klos v. Lotnicze*,
    133 F.3d 164 (2d Cir. 1997) ................................................ 36, 39

*Lyons v. NBCUniversal Media, LLC*,
    2019 WL 6703396 (C.D. Cal. 2019) ......................................... 41

*McArdle v. AT&T Mobility, LLC*,
    2017 WL 4354998 (N.D. Cal. 2017)........................................... 31

*McGill v. Citibank, N.A.*,
    2 Cal.5th 945 (2017) ......................................................... passim

*Mejia v. DACM Inc.*,
    54 Cal.App.5th 691 (2020) ........................................................ 14, 19, 31

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985).................................................................. 42

*Monster Energy Co. v. City Beverages, LLC*,
    940 F.3d 1130 (9th Cir. 2019) ................................................. 44

*Morris v. Temco Serv. Indus., Inc.*,
    2010 WL 3291810 (S.D.N.Y. 2010) ................................... 42, 43

*Nia v. Bank of America, N.A.*,
    603 F.Supp.3d 894 (S.D. Cal. 2022) ...................................... 25

*OTO, L.L.C. v. Kho*,
    8 Cal.5th 111 (2019) ........................................................... 33-36

*Paracor Finance, Inc. v. General Elec. Capital Corp.*,
    (9th Cir. 1996) 96 F.3d 1151 .................................................. 18

*Pathway Med. Techs., Inc. v. Nelson*,
    2011 WL 4543928 (D. Ariz. 2011) .................................... 12, 19

*Peleg v. Neiman Marcus Grp., Inc.*,
    204 Cal. App. 4th 1425 (2012) ............................................... 41

*Pinela v. Neiman Marcus Grp., Inc.*,
    238 Cal. App. 4th 227 (2015) ................................................. 32

*Ramos v. Superior Court*,
    28 Cal.App.5th 1042 (2018) ............................................. 44, 45

*Ruiz v. Affinity Logistics Corp.*,
    667 F.3d 1318 (9th Cir. 2012) ..................................... 14, 20, 29

*State Farm Fire & Cas. Co. v. Abraio*,
    874 F.2d 619 (9th Cir. 1989) .................................................. 17

*Storms v. Paychex, Inc.*,
    2022 WL 2160414 (C.D. Cal. 2022) ........................................................ 45

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003) ........................................................ 43, 44

*Vaughn v. Tesla, Inc.*,
    87 Cal.App.5th 208 (2023) ........................................................ 3, 14, 21-25

*Vestar Dev. II, LLC v. Gen. Dynamics Corp.*,
    249 F.3d 958 (9th Cir. 2001) ........................................................ 24

*Zoller v. GCA Advisors, LLC*,
    993 F.3d 1198 (9th Cir. 2021) ........................................................ 34

**Statutes**

28 U.S.C. § 1331 ........................................................ 3

28 U.S.C. § 1343 ........................................................ 3

28 U.S.C. § 1291 ........................................................ 3

Cal. Bus. & Prof. Code, § 17200 *et seq.* ........................................................ 20

Cal. Bus. & Prof. Code, § 17500 *et seq.* ........................................................ 20

Cal. Gov. Code § 12920 ........................................................ 20

**Rules and Regulations**

Fed. R. App. P. 4 ........................................................ 3

**Other Authorities**

Restatement (Second) of Conflict of Laws § 1987 ........................................................ 19

Restatement (Second) of Conflict of Laws § 1988 ........................................................ 21, 26-30

# I.       INTRODUCTION

In 2020, Defendant-Appellee American Express ("AmEx") implemented company-wide policies that required all business decisions to be viewed through a racial lens. Employees who joined AmEx with the promise of a merit-based culture were suddenly informed that the terms and conditions of their employment would be governed by a quota system. This system, they were told, would explicitly favor black workers. One executive summarized the policy succinctly when he told directors under him, "we are only hiring black people from now on." ER 191.[1]

AmEx's new policies also had an additional component. While white workers were subject to a top-down racial engineering system, AmEx mandated that *all* employees give preferential treatment to existing and potential black customers. Employees who simply followed existing rules and applied the same financial qualification criteria to potential clients, regardless of race, were disciplined or fired.

Plaintiffs-Appellants ("Plaintiffs") are former employees of AmEx who lost their jobs for challenging these policies or simply because they were white. Their Second Amended Complaint ("SAC") seeks public injunctive relief to enjoin AmEx's race-based policies under California's unfair business practices and employment laws.

AmEx moved to compel the case to arbitration pursuant to an agreement that

---

[1] "ER" refers to the Excerpts of Record.

several of the Plaintiffs were deceived or unfairly pressured into signing. The arbitration agreement in question contains an "Individual Claims Only" clause that prohibits public injunctive relief. It also includes a 'poison-pill' provision that voids the agreement, in its entirety, if the former clause is found to be unenforceable.

Because the "Individual Claims Only" clause violates fundamental California policy favoring public injunctive relief, the entire agreement is void under the California Supreme Court's ruling in *McGill v. Citibank, N.A.* 2 Cal.5th 945 (2017) (the "*McGill* rule"). Plaintiffs opposed arbitration on these grounds and due to the agreement's overall unconscionability. The district court held that the *McGill* rule was inapplicable because Plaintiffs were not seeking public injunctive relief. The district court also held that, regardless, New York law applied because of the agreement's choice of law provision.

The district court committed several errors in reaching its conclusion. First, the choice of law analysis was conducted collectively, rather than individually for each plaintiff. An individualized inquiry requires that California law be applied to the interpretation of AmEx's agreement. This is because the state has a materially greater interest in preventing discrimination within its borders and the discrimination experienced by Plaintiffs affected California—not New York—residents. Second, plaintiffs are seeking a public injunction under *McGill* because "[a]n injunction against further employment discrimination by Defendant would inure to the benefit

of not only current…employees, but to the benefit of their families and their communities, as well as to the benefit of future…applicants and employees." *Vaughn v. Tesla, Inc.*, 87 Cal.App.5th 208, 232 (2023), *review denied* (Apr. 12, 2023). Finally, the agreement is unconscionable regardless of whether it is interpreted under New York or California law. AmEx did not give Plaintiffs any meaningful choice in signing the arbitration agreement, which is also permeated with unlawful terms. For these reasons, it cannot be enforced.

## II.    JURISDICTIONAL STATEMENT

This appeal arises from the district court's order granting AmEx's motion to compel arbitration and dismiss the SAC filed by Plaintiffs. The district court issued its order granting the motion to compel arbitration and dismissing the case on August 3, 2023. ER 3-13. The Clerk of Court terminated the case, pursuant to the district court's order, the same day. ER 222. Plaintiffs filed a timely notice of appeal on August 9, 2023. ER 220-221; *see also,* Fed. R. App. P. 4(a)(1)(A) (30 days from entry of order appealed from to file notice of appeal).

The district court had original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the case arose under the laws of the United States and was brought to recover damages for deprivation of equal rights. This Court has jurisdiction under 28 U.S.C. §1291 to review the district court's final decision. See *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014) ("an

order compelling arbitration and dismissing the action is" immediately appealable.).

## III.   STATUTORY AUTHORITIES

Pertinent statutes and other authorities appear in the Addendum to this brief.

## IV.   ISSUES PRESENTED

1.     The Plaintiffs in this case are from different jurisdictions. Did the district court err in analyzing the choice of law collectively, rather than individually, for each Plaintiff?

2.     California has a fundamental policy that prohibits contractual terms that waive a party's right to pursue public injunctive relief. New York does not. The arbitration agreement in this case, which affects California citizens, includes such a waiver. Does California have a materially greater interest in deciding the enforceability of this agreement than New York?

3.     In the absence of an effective choice of law provision in the parties' agreement, would a racial discrimination employment dispute affecting California citizens be decided under California law?

4. The California Legislature and Supreme Court have declared that the prevention of employment discrimination benefits the public in general and not just the employees and applicants affected by the discrimination. Does Plaintiffs' request for an injunction enjoining such discrimination by AmEx constitute public injunctive relief?

5.     Is an adhesive arbitration agreement that gives AmEx the right to avoid

adjudication in any forum unconscionable?

## V.    STATEMENT OF THE CASE AND FACTS

### A.    AmEx Institutes Racial Engineering Policies for Its Employees and Customers

Sometime after the death of George Floyd in 2020, AmEx's CEO and Board of Directors consciously changed the company's hiring and promotion practices. ER 190. Whereas AmEx previously hired based on talent and position fit, and promoted on the basis of merit, it now implemented a policy of basing hiring and promotion decisions on race alone. ER 187. The new AmEx policy not only focused on race, it made race the only relevant factor in hiring and promotion decisions. ER 187-188. The policy also extended to decisions about layoffs, disproportionately affecting white employees—even those having far better performance records than black peers who were retained. ER 193.

These top-down policies were operationalized in July 2020 during a town-hall meeting with AmEx CEO, Stephen Squeri. ER 190. During that meeting, Mr. Squeri ordered that the percentage of black AmEx employees in every position in the company's hierarchal structure must correspond to that of the U.S. population by 2023. *Id.* This quota system was non-negotiable and Mr. Squeri suggested that employees leave the company if they did not agree. *Id.*

The new policies unabashedly favored black employees over white. ER 191-192. By implementing these policies, AmEx effectively established a racial

engineering system to hire or retain black employees—regardless of qualifications and performance—over white employees. ER 191-193.

The quota system applied to AmEx customers as well. Employees were required to find and give preferential treatment to existing and potential black customers. ER 190. AmEx changed its financial qualifications and protections for only black customers and punished employees who questioned black customers' qualifications using the same standards they would apply to non-black customers. *Id.* This policy even led to white employees being fired for adhering to previous company guidelines regarding a customer's financial qualifications. *Id.*

### B. Plaintiffs Experience Differential Treatment or Explicit Hostility From AmEx Management Because of Their Race

Each of the Plaintiffs below was affected by AmEx's racial quotas and policies despite holding positions in different business units throughout the company. Plaintiff Nancy Larson ("Larson") had been with AmEx for 29 years when she was forced to resign. ER 204. Ms. Larson was the Director of Account Development for the Los Angeles area and managed a team of employees. *Id.* All but three of her 29 years at AmEx were spent living and working in California, dealing exclusively with California coworkers and clients. ER 84.

After AmEx instituted its race-based policies, Ms. Larson was pressured by her supervisor to hire a black employee and when the employee did not meet expectations, Ms. Larson was instructed to give the employee preferential treatment because of his

race. ER 204. In response to Ms. Larson's objections to this kind of preference, she was given a negative performance review, which reduced her own income. ER 205. Ms. Larson's performance was also rated lower than her peers, who were non-white leaders, despite her objectively superior performance. *Id*. Ms. Larson was continually counseled to treat black employees differently than whites, even to the point of working to remove white employees from the company. ER 206.

When Ms. Larson attempted a lateral transfer within the company to avoid this race-based harassment, she was shut out of the opportunity by Therese Banks, the same black executive who fired Mr. Netzel because of his race. ER 206-207. When Ms. Larson found out that Ms. Banks gave the job to a younger black male with no relevant experience, she was left with no reasonable choice but to resign. *Id.*

Plaintiff Brian Netzel ("Netzel") was a client manager in the Global Merchant Network Services group at AmEx. ER 197. During his employment, a substantial portion of Mr. Netzel's portfolio involved servicing California clients as well as helping California-based managers close deals in the state. ER 70.

When Mr. Netzel initially applied to work for AmEx in 2010 it was based on the promise of a merit-based working environment. However, when his new boss, Therese Banks, a black woman, took over in 2019, she quickly implemented race-based quotas on hiring decisions. ER 197. When a candidate was black, Ms. Banks applied different hiring and promotion standards to evaluate them. For example, while

Ms. Banks openly stated that she required candidates to have a college degree for certain positions, this requirement was set aside for several black applicants. ER 198. Mr. Netzel challenged these practices and Ms. Banks fired him in October 2020. ER 199.

Mr. Netzel was never told by anyone at AmEx, either before or during his employment, that he would be subject to an arbitration policy that stripped him of his right to have his day in court. On his first day at AmEx, while in the middle of mandatory trainings, Mr. Netzel was called into his manager's office. ER 69. The manager placed a large stack of documents in front of Mr. Netzel and said something to the effect of "I'm real busy and you have to sign these quickly because I need to get them to corporate." *Id.* She did not inform Mr. Netzel about the nature of the documents and rushed him through the process of completing them so she could get him out of the office. *Id.* Mr. Netzel was not given a copy of any of the documents he was required to sign. ER 70. He had no idea that a document forcing him into arbitration was slipped into these onboarding documents.

Plaintiff Travis Smith ("Smith") was similarly not informed that he would be subject to mandatory arbitration until after he committed himself to moving from Chicago to Phoenix for the opportunity at AmEx. ER 77. Mr. Smith was a band 35 senior manager in the Commercial Acquisition Group. ER 200. He led a team of 10 employees, which included making hiring and promotion decisions within his team.

ER 201. A substantial part of Mr. Smith's sales work consisted of California leads. Mr. Smith would often spend all afternoon reaching out to California leads and a significant portion of the accounts he signed up were California residents. ER 78. Mr. Smith enjoyed success at AmEx and had been promoted a year after starting at the company. ER 200.

When Mr. Smith sought an additional promotion, or when he sought to hire someone for his own team, AmEx executives thwarted his efforts based on AmEx's race-based quotas. ER 200-201. Mr. Smith's desire to hire the most qualified candidate, or to be promoted because *he* was the most qualified candidate, triggered AmEx to reeducate him on the race-based policies. ER 201. At the same time Mr. Smith sought a promotion, AmEx was actively removing white directors in favor of less qualified black candidates—or leaving the position open. ER 201-202. Mr. Smith applied for a promotion another time, only to be bullied out of the room and told that he was a racist and "not fit for leadership." ER 202. Mr. Smith had reported that he was being treated differently based on race, but AmEx did not investigate his complaints. ER 201. Mr. Smith resigned from AmEx as a result. ER 202.

Mr. Langkamp's experience was similar to the other plaintiffs. He was a band 35 manager of business development in the GCS group. ER 202. Mr. Langkamp received the same race-based training and directives as the other Plaintiffs. ER 203.

One of those directives was that no employees would receive merit or annual raises during the COVID pandemic because of its financial impact to the company. *Id.* However, shortly after, Mr. Langkamp found out that another member of his team, a black employee, received a raise. *Id.* That employee was the lowest performing member of the team, and fell below his performance goals, but he was the only black employee on the team. *Id.* That black employee asked his director whether he was given a raise solely because he was black, and the director confirmed that that was the reason. *Id.* That employee resigned from the company because he was given preferential treatment solely based on his race. *Id.*

In addition to compensation policies, AmEx enforced disciplinary policies in a race-based way, punishing white employees with termination or fines but leaving black employees alone, even when they had clearly violated policy. *Id.* After seeing many white colleagues fired during a layoff, while black employees remained, Mr. Langkamp was forced to resign from the company in 2022. ER 204. Like Mr. Netzel, Mr. Langkamp was pressured into signing the arbitration agreement with false time constraints that did not give him a meaningful choice to negotiate, or even understand, the rights that he was signing away. ER 81, 96.

### C. Plaintiffs File Suit to Enjoin AmEx's Discrimination

Plaintiff Netzel filed suit against AmEx, on behalf of himself and others similarly situated, on August 23, 2022, alleging racial discrimination, harassment, and

retaliation. ER 224. A First Amended Complaint was filed on September 14, 2022, adding Plaintiffs Smith, Langkamp, and Larson. *Id.* Plaintiffs filed the SAC on November 21, 2022. ER 181. To remedy their injuries, Plaintiffs sought compensatory and punitive damages. ER 181. Plaintiffs also sought public injunctive relief under California's unfair business practices and equal employment opportunity statutes to prevent AmEx from enforcing or adopting racial quotas on hiring, firing, and promotions or requiring workers to treat existing and potential customers differently based on race. ER 181, 219.

AmEx moved to dismiss the case and force the Plaintiffs into arbitration on December 12, 2022. ER 164. The motion was based on an Arbitration Policy (the "Agreement") that AmEx implemented in 2003. ER 117, 123-135. The Agreement includes three main provisions that are in dispute in this appeal:

The first is an "Individual Claims Only" clause in Section II.D(l), which states:

> The arbitrator's authority to resolve disputes is limited to disputes between: a) an individual and American Express or an American Express employee benefit plan (including retirement, health and/or welfare plans or arrangements) alone; or b) the individual and an another individual covered by this Policy alone and *the arbitrator's authority to make awards is limited to awards to those parties alone. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.*

ER 126 (emphasis added).

The second, a "poison pill" provision, is also located in Section II.D(l). It states:

> Notwithstanding any other provision in this Policy . . . should any portion of this Section II.D(l) "Individual Claims Only" be deemed invalid, void or unenforceable, *then the entire Policy (other than this sentence) shall be unenforceable and not apply*.

*Id*. (emphasis added).

Finally, the Agreement's choice of law provision states that "[t]his Policy shall be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of laws." ER 135.

On April 4, 2023, Plaintiffs filed their opposition to AmEx's motion. ER 47. The district court granted AmEx's motion on August 3, 2023 and dismissed Plaintiff's SAC, thus closing the case. ER 3-13. Plaintiffs filed a timely appeal on August 9, 2023. ER 220-221.

## VI.    SUMMARY OF ARGUMENT

The resolution of this appeal rests largely on determining which state's laws apply to the interpretation of the arbitration agreement in question, which has a New York choice of law provision. Under the rules of the forum state, Arizona, this provision is unenforceable if New York law contradicts a fundamental policy of a state with a materially greater interest in the issue at hand and which would also be "the state of the applicable law in the absence of an effective choice of law by the parties." *Pathway Medical Technologies, Inc. v. Nelson*, 2011 WL 4543928, at \*4 (D. Ariz. 2011). In that case, the laws of the state with the materially greater interest

will apply.

The district court—analyzing the choice of law question collectively, not individually, for plaintiffs from several jurisdictions—ruled that New York law governs because the determination would otherwise be made too difficult due to the widely dispersed contacts. However, "in cases involving multiple plaintiffs from multiple jurisdictions, the choice of law must be made on an individual plaintiff-by-plaintiff basis." *Barba v. Seung Heun Lee,* 2010 WL 11515658, at *11 (D. Ariz. 2010). Because the district court applied the wrong standard at the outset, the rest of the analysis regarding the enforceability of the agreement against the individual Plaintiffs was flawed. Conducting the proper analysis requires the Agreement to be interpreted using California law for Plaintiffs Larson, Netzel, and Smith. It also requires the Agreement to be found unenforceable for the following reasons:

**First**, the Agreement contains an "Individual Claims Only" clause that prohibits Plaintiffs from seeking public injunctive relief in any forum. This clause violates fundamental California policy pursuant to the *McGill* rule. New York has no policy against contracts that waive a litigant's right to seek public injunctive relief. Thus, applying New York law under the circumstances here would be contrary to a fundamental policy of California.

California also has a much greater interest than New York in the determination of the relevant issue: "the enforceability of arbitration contracts which purport to

waive the right to seek public injunctive relief." *Mejia v. DACM Inc.*, 54 Cal.App.5th 691, 701 (2020). "In determining which state has a materially greater interest, California courts consider which state, in the circumstances presented, will suffer greater impairment of its policies if the other state's law is applied." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1324 (9th Cir. 2012) (internal quotation marks omitted). California has a strong public interest in protecting employees and consumers from racially discriminatory conduct as well as unfair and unlawful business practices within its borders. These policies would be greatly impaired if Plaintiffs were forced to waive their right to seek injunctive relief and to enjoin Defendant's unlawful conduct.

**Second**, the California Supreme Court has recognized that the state has a fundamental policy prohibiting discrimination in the workplace and that this policy "inure[s] to the benefit of the public at large." *Stevenson v. Superior Court*, 16 Cal.4th 880, 892 (1997) (internal quotation marks omitted). Thus, a complaint that requests a public injunction to enjoin racial discrimination in the workplace—like the one in this case—"has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public" *Tesla,* 87 Cal.App.5th at 232 (internal quotation marks omitted). Therefore, Plaintiffs' request for public injunctive relief in this case falls squarely within the *McGill* rule.

**Third**, having established that California has a greater interest, the Court must

determine whether it would have been the state of applicable law in the absence of the Agreement's choice of law provision. For this, the Court must analyze each Plaintiff's situation individually. See *Barba,* 2010 WL 11515658, at *11. With respect to Plaintiff Larson, the fact that she lived and worked in California—and exclusively serviced California clients—is dispositive. Everything about Ms. Larson's claims relates to California, not New York.

The job functions of Plaintiffs Netzel and Smith also heavily involved California. A substantial portion of Mr. Netzel's portfolio involved servicing California clients and Mr. Smith was charged with signing up California sales leads. They would both spend a significant amount of their days focused on California-related businesses. Notably, the racially discriminatory policies AmEx implemented required Plaintiffs to give preferential treatment to black clients in California. Based on these facts, New York does not have an interest in the outcome of this issue whatsoever because it was California, not New York, residents who were impacted by AmEx's applied bigotry within California's borders. Therefore, because the relevant issue here centers on Plaintiffs' request for relief that would protect Californians against AmEx's discrimination, there is no question that California would be the state of applicable law.

**Fourth**, the Agreement includes a 'poison pill' provision that renders the entire contract void if the "Individual Claims Only" clause is found unenforceable.

As explained, above, the clause is unlawful under California law because it violates the *McGill* rule. AmEx's 'poison pill' thus renders the Agreement unenforceable against Plaintiffs Larson, Netzel, and Smith.

**Finally**, the Agreement is also void under both New York and California law because it is procedurally and substantively unconscionable. AmEx presents its adhesive contract to new hires on a take-it-or-leave-it basis without giving them any meaningful choice to negotiate its terms. In some cases, like with Plaintiffs Netzel, Langkamp, and Smith, AmEx uses deceptive or high-pressure tactics to obtain signatures without informing employees that they are signing away their right to pursue their claims in court.

The substantive terms of the Agreement similarly tilt the playing field heavily in favor of AmEx. First, AmEx gives itself the right to unilaterally change the terms of its arbitration policy, even when an employee's claim against it has already accrued. Second, a gatekeeping provision requires that employees file arbitration claims through AmEx rather than allowing them to proceed directly to the third party administrator. This allows AmEx to avoid resolution of claims against it entirely by ignoring or denying the claim outright. Third, the Agreement's confidentiality clause gives AmEx an unfair, repeat-player advantage and stifles employees' ability to investigate and coordinate their cases. Because the Agreement is permeated with illegality, it is unconscionable and cannot be enforced against Plaintiffs.

## VII.  STANDARD OF REVIEW

"The district court's decision to grant or deny a motion to compel arbitration is reviewed de novo." *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1152 (9th Cir. 2004). The district court's interpretations of California state law are also reviewed de novo. See *State Farm Fire & Cas. Co. v. Abraio,* 874 F.2d 619, 621 (9th Cir. 1989). "When the [California] state supreme court has not ruled definitively on a point, this court looks to decisions by intermediate appellate state courts for guidance…[and]…should follow these decisions unless there is convincing evidence that the [California] state supreme court would decide differently." *Id.* (cleaned up). "This is especially true when the [California] supreme court has refused to review the lower court's decision." *Id.*

## VIII.  ARGUMENT

### A.  AmEx's Arbitration Agreement Must Be Interpreted Under California Law

#### 1.  The "Individual Claims Only" clause bars Plaintiffs from seeking public injunctive relief in any forum

The Agreement's "Individual Claims Only" clause (Section II.D(l)) requires Plaintiffs to resolve all claims against AmEx through arbitration, on an individual basis, and limits the arbitrator's authority to award relief only to the named plaintiff and AmEx. ER 126. The provision's language, indicating that "[t]he arbitrator will not award relief for or against anyone who is not a party," has been consistently interpreted by the courts as a waiver on the right to seek public injunctive relief. See

*Adkins v. Comcast Corporation*, 2018 WL 4846548, at *1 (N.D. Cal. 2018) ("The arbitrator may award relief only in favor of the individual party seeking relief... The arbitrator may not award relief for or against anyone who is not a party."); *see also, Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 831 (9th Cir. 2019) ("[T]he agreement prohibits the arbitrator from awarding 'relief that would affect RAC account holders other than you,' and…thus precludes the arbitrator from awarding public injunctive relief.").

Because AmEx prohibits Plaintiffs from resolving their claims in court and prevents them from resolving certain claims in arbitration, Plaintiffs are foreclosed from seeking public injunctive relief in *any forum* under the Agreement. As explained in further detail, below, this renders the "Individual Claims Only" provision void under California law.

> **2.** **California has a materially greater interest than New York in determining whether AmEx can prohibit Plaintiffs from seeking a public injunction**

Arizona's choice of law rules govern the determination of which state's substantive law should be used to interpret the Agreement. See *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) ("In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state."). Under these rules, "language purporting to preclude the courts from applying the principles of conflicts of laws is nugatory and void." *Mann v. GTCR Golder Rauner,*

*L.L.C.*, 351 B.R. 685, 695 (D. Ariz. 2006).

Arizona follows the Restatement (Second) of Conflict of Laws § 187 on choice of law questions. *Pathway,* 2011 WL 4543928, at *2. It states, in relevant part:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless…
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the *particular issue* and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1988) (emphasis added).[2]

The issue in question here is the enforceability of the Agreement which prohibits Plaintiffs from seeking public injunctive relief in any forum. California has a fundamental policy which prohibits contractual waiver of this right. See *McGill*, 2 Cal.5th at 955; *see also, Mejia*, 54 Cal.App.5th at 701 ("The California Supreme Court's *McGill* decision articulates the state's fundamental policy against enforcing the contractual waiver of the right to seek in any forum a public injunction."). The purpose behind this rule is to ensure that laws created for the protection of the public

---

[2] All further references to the Restatement (Second) of Conflict of Laws will be cited as the "Restatement."

are not toothless or easily undermined by powerful, private interests. See *Blair*, 928 F.3d at 824 ("[A]n agreement to waive the right to seek public injunctive relief violates California Civil Code § 3513, which provides that 'a law established for a public reason cannot be contravened by a private agreement.'"). Applying New York law, which does not prohibit waiver of the right to seek public injunctive relief, would be contrary to fundamental California policy. See *Hope v. Early Warning Services LLC*, 2023 WL 5505020, at *8 (C.D. Cal. 2023) ("Defendant does not dispute Plaintiff's assertions that New York law is contrary to a fundamental policy of California protecting a consumer's right to seek out public injunctive relief in certain fora.").

California also "has a materially greater interest than New York in enforcing its policy of refusing to permit contractual terms that eliminate this right." *Id.* This is because California has a strong public interest in protecting the general public from racially discriminatory conduct as well as unfair and unlawful business practices within its borders. See Cal. Gov. Code § 12920; *see also*, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500 *et seq.* ("unfair competition law" or "UCL"). "In determining which state has a materially greater interest, California courts consider which state, in the circumstances presented, will suffer greater impairment of its policies if the other state's law is applied." *Ruiz*, 667 F.3d at 1324 (internal quotation marks omitted). These policies would be greatly impaired if Plaintiffs were forced

to waive their right to seek injunctive relief to enjoin Defendant's unlawful conduct

Finally, as will be discussed below, under Restatement § 188, California would be the state of applicable law in the absence of the New York choice of law provision.

## B.  Plaintiffs Seek Public Injunctive Relief

The district court held that the *McGill* rule did not apply because it concluded that "Plaintiffs do not seek relief with the purpose of prohibiting unlawful acts that threaten the general public with future injury." ER 8. This is at variance with the explicit finding of the California "Legislature and the California Supreme Court [which] have clearly stated that [the prevention of discrimination] is for the benefit of the public in general and not just the employees and applicants affected by the discrimination." *Tesla,* 87 Cal.App.5th at 231, n. 16

In *Tesla*, the California Court of Appeal held that injunctions under California's Fair Employment and Housing Act ("FEHA") fall within the subset of claims that seek to enjoin conduct that affects the public at large. 87 Cal.App.5th at 232. This is because,

> [a]n injunction against further employment discrimination by Defendant would inure to the benefit of not only current [] employees, but to the benefit of their families and their communities, as well as to the benefit of future [] applicants and employees. Furthermore, as the California Supreme Court recognized in *Stevenson* [16 Cal.4th 880], FEHA is premised on the Legislature's finding that invidious discrimination harms the public at large, including

> individuals lacking any direct connection to the workplace
> involved.

*Id.* at 232 (cleaned up).

*Tesla* further noted that there is no articulable reason why "injunctions sought under the false advertising law, the UCL, and the CLRA [Consumer Legal Remedies Act] may be viewed as primarily benefitting the public but an injunction sought under FEHA [which may be enforced through the UCL] may not." *Id.* at 231. Indeed, there is nothing in *McGill* that limits the application of the rule to injunctions under just the UCL and CLRA alone. The reason being that there is a broad range of conduct beyond false advertising that threatens the public with future injury. See, *e.g., Blair*, 928 F.3d 819 (charging excessive prices to consumers for rent-to-own household items). Pervasive racial discrimination enthusiastically carried out by one of the world's largest financial institutions indisputably falls into that category.

Plaintiffs acknowledge this Court's decision in *Hodges v. Comcast Cable Communications, LLC* where a divided panel held that a cable subscriber who brought an action to require Comcast to disclose its data-collection practices did not seek public injunctive relief. 21 F.4th 535 (9th Cir. 2021). The *Hodges* panel, writing two years before *Tesla*, rested that conclusion on two main arguments: First, that the relief requested by plaintiff would primarily benefit existing Comcast customers rather than the public at large. See *id.* at 545-546. Second, that the plaintiff was attempting to expand *McGill* to say that "*any* forward-looking relief to enjoin *any*

illegal conduct is automatically public injunctive relief." *Id.* at 545. According to *Hodges*, the California Supreme Court would not countenance such an expanded reading of the *McGill* rule. [3]

What makes the reasoning in *Hodges* inapplicable in this case is the explicit California legislative finding that racial discrimination in the workplace, especially in a company of AmEx's size and influence, is not simply '*any* illegal conduct' but illegal conduct that *specifically* harms the general public.

> [A]t issue in *Hodges* was a claim regarding a cable company's 'privacy and data-collection practices'… The present case involves the prevention of discrimination, and the Legislature and the California Supreme Court have clearly stated that accomplishment of that goal is for the benefit of the public in general and not just the employees and applicants affected by the discrimination.

*Tesla,* 87 Cal.App.5th at 231 n. 16.

In *Hodges* there was no discussion, much less a conclusive finding, that the laws in question targeted acts that harm the general public rather than individuals specifically affected by the illegal conduct. Here, conversely, AmEx's racially discriminatory policies are legislatively and judicially recognized as causing harm to the public at large, not just the individual Plaintiffs.

---

[3] The conclusion in *Hodges* is also difficult to reconcile with this Court's earlier decision in *Blair*, which held that plaintiff's request to enjoin Rent-A-Center's charging excessive fees and provide individualized notice to consumers fit within the parameters of *McGill. Compare Blair*, 928 F.3d at 823 *with Hodges*, 21 F.4th at 548-549.

Because of these crucial distinctions, *Tesla* controls here. It is the only published appellate decision on *McGill*'s applicability to FEHA and the decision is consistent with the California Supreme Court's reasoning on these issues. *See Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) ("[W]here there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts."). Further, the California Supreme Court's denial of review in *Tesla* is significant. It "may be taken as an approval of the conclusion there reached" even if not necessarily embracing all the reasoning of the Court of Appeal. *Di Genova v. State Bd. of Ed.*, 57 Cal.2d 167, 178 (1962).

### 1. AmEx's discriminatory policies harm the general public

Here, Plaintiff Larson, who was a California-based employee dealing exclusively with AmEx's California customers alleges FEHA causes of action. ER 211-217. However, *all* Plaintiffs seek public injunctive relief under the UCL to enjoin not only AmEx's racialist policies in the workplace but also those aimed at existing and potential customers. ER 217-218. In the summer of 2020, AmEx explicitly announced racial quotas for the positions occupied by Plaintiffs and for those to which Plaintiffs sought promotions. ER 190. AmEx also required Plaintiffs to racially discriminate against their California-based clients. ER 70-71, 78, 183, 187, 190. These clients made up the entirety of Larson's portfolio and a significant

part of Netzel and Smith's. ER 70-71, 78, 84.

The SAC's underlying allegations of "intentional discrimination, which amounts to immoral, unethical, oppressive, or unscrupulous conduct" under Title VII, 42 U.S.C. § 1981, and FEHA may be enforced through the UCL. *Nia v. Bank of America, N.A.*, 603 F.Supp.3d 894, 908 (S.D. Cal. 2022) (holding that plaintiff's claim under 42 U.S.C. § 1981 pled an underlying violation of substantive law that could support a UCL claim). This "invidious discrimination harms the public at large, including individuals lacking any direct connection to the workplace involved." *Tesla*, 87 Cal.App.5th at 232.

Indeed, the U.S. Supreme Court recently emphasized this point when it outlawed the race-based admissions policies enacted by Harvard College and the University of North Carolina. Holding that the schools' racial quotas violated the Equal Protection Clause of the Fourteenth Amendment, the Court cautioned that, "[i]t would be a sad day indeed, were America to become a quota-ridden society, with each identifiable minority assigned proportional representation in every desirable walk of life." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 213 (2023) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 342-343 (2003)).

By extension then, if employment-based discrimination by a multi-national financial institution like AmEx harms the public, and not just individual employees,

then certainly AmEx's discrimination in the provision of its goods and services can be said to be just as harmful. See *Heart of Atlanta Motel, Inc. v. U. S.*, 379 U.S. 241, 245 (1964) (the Civil Rights Act was passed by Congress "to promote the general welfare by eliminating discrimination based on race, color, religion, or national origin."). Given that this discrimination extends far beyond the individual workplace and touches customers who far outnumber the employees in question, an injunction requiring AmEx to treat employees and existing and potential customers alike— regardless of race—is the very definition of a public injunction.

## C. The District Court Erred by Failing to Analyze the Choice of Law on a Plaintiff-by-Plaintiff Basis

Having established that California has a materially greater interest in the present matter, Plaintiffs must also show that, under Restatement § 188, California law would be applicable in the absence of the Agreement's New York choice of law provision. The district court erred in concluding that it is not. Despite the district court's recognition of Plaintiffs' California connections, the court ruled that the contacts at issue in the case "are so widely dispersed that determination of the state of the applicable law without regard to the parties' choice would present real difficulties." ER 8.

There are two flaws with this conclusion: First, the district court should have performed a separate analysis for each plaintiff, individually, rather than collectively. *Barba*, 2010 WL 11515658, at *11 ("[I]n cases involving multiple

plaintiffs from multiple jurisdictions, the choice of law must be made on an individual plaintiff-by-plaintiff basis, even if the number of jurisdictions involved makes the choice of law analysis burdensome."). Second, the district court's determination regarding Restatement § 188 failed to consider the separate contacts in order of relative importance. This is crucial when one factor is dispositive on the issue in question, as it is here. When these two considerations are accounted for, it becomes clear that California law, not New York, should govern the interpretation of the Agreement.

### 1. Larson's employment with AmEx was tied exclusively to California

Restatement § 188 lays out the five factors to be considered when determining the state of applicable law in the absence of a choice of law provision. These factors are, "(1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the 'location of the subject matter of the contract[;]' and (5) the residence, place of incorporation, and place of business of the parties." *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 809 (9th Cir. 2019).

However, these factors are not all equal. "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* And the issue here is whether the Agreement can force Plaintiffs to waive their right to seek injunctive relief that would protect Californians against AmEx's discrimination.

For Ms. Larson, even without weighing the factors, nearly all of them favor California. Ms. Larson spent more than 25 years working for AmEx and living in California. ER 84. Ms. Larson also occupied leadership roles in AmEx's Southern California offices where she supervised California employees. ER 84. The accounts that she serviced were all headquartered in California. *Id.* Everything about Ms. Larson's claims relates to California, not New York. Even if Ms. Larson can be considered to have subjected herself to the Agreement, AmEx concedes that it sent the Agreement to Ms. Larson in California. ER 30. The only connection with New York is that it is the place where AmEx is incorporated.

Under very similar circumstances, a California district court held that "California should be the 'state of applicable law' under…[Restatement] § 188" for a California-based employee in a suit against his Connecticut employer. *Davis v. Advanced Care Technologies, Inc.*, 2007 WL 2288298, at *8 (E.D. Cal. 2007). The court stated,

> because Davis was based out of California, and responsible for sales in California, the subject matter and performance of the contract occurred at least in part in California. Further, because Davis was assigned to the western region, and reported to supervisors in Arizona and Colorado, his responsibilities and supervision had little or nothing to do with Connecticut. Finally, at all relevant times, Davis resided and worked out of California.

*Id.*

Based on the above individual analysis, the *Davis* court found that California

law would apply in the absence of a valid choice of law provision. *Id.* at *9. Thus, the relevant authority makes clear that in this case, as in most employment law matters, the place of performance is the most important factor. See *id.*; *see also, Ruiz*, 667 F.3d at 1324 (California law applied because employee drivers entered into the contract and worked in California and the subject of the contract where drivers made deliveries was in California, despite the defendant being incorporated in Georgia).

Here, it is undisputed that the place of Ms. Larson's performance of her work for AmEx was in California. Thus, all of the factors—other than the place of AmEx's incorporation, which is not important to the issue in question—weigh heavily in favor of California.

### 2. California featured heavily in Netzel's work

For Mr. Netzel, examination of the Restatement § 188 factors in order of importance leads to a similar result. Although Mr. Netzel worked out of AmEx's Phoenix location while employed with them, his job functions focused heavily on California. ER 70. A substantial portion of Mr. Netzel's portfolio involved servicing California clients. *Id.* He would spend a significant percentage of his work hours focused on California-related businesses. *Id.* Mr. Netzel often worked with managers of business development, many of whom were located in California, and helped to close many deals in the state. *Id.* Notably, the racially discriminatory policies AmEx implemented pressured employees like Mr. Netzel to give preferential treatment to

black clients, including those located in California. ER 70-71.

"Looking, then, to the totality of the relevant Section 188 factors, only the fifth weighs significantly and unequivocally in favor of [AmEx] and the application of [New York] law." *Ingenco,* 921 F.3d at 812. The most important factor with respect to the particular issue of enjoining AmEx's discrimination in California, "the location of the subject matter of the contract, weighs heavily in favor of" California law. *Id.* The rest of the factors "are either neutral or, to the extent they weigh in favor of [New York] law, are not particularly important." *Id.* Given that the location of Mr. Netzel's work, and AmEx's discriminatory policies, reached significantly into California—the state's fundamental policy of enjoining the discrimination practiced by AmEx makes it the state of applicable law with respect to the Court's analysis.

### 3. The subject matter of Smith's employment was also significantly related to California

Mr. Smith's situation, with respect to the Restatement § 188 inquiry, is nearly identical to Mr. Netzel's. Mr. Smith was a salesman for AmEx whose work substantially consisted of reaching out to California leads. ER 78. On some days Mr. Smith would often spend all afternoon working exclusively on potential clients in California and a significant portion of the accounts he signed up were California residents. *Id.* AmEx's directives to treat individuals differently based on race were directed not only at employees but were explicitly directed at potential clients like the ones Mr. Smith would pursue in California. *Id.* Given California's fundamental

interest in preventing discrimination against its residents and businesses, the interpretation of the Agreement for Mr. Smith should also be analyzed under California law.

### D. AmEx's Poison Pill Provision Invalidates the Agreement in Its Entirety

As discussed above, Plaintiffs are seeking public injunctive relief to enjoin AmEx's racially discriminatory policies under FEHA and the UCL. Under the *McGill* rule, the Agreement's prohibition on such relief, in any forum, renders that portion of the agreement void under California law. This triggers the 'poison pill' provision which requires that the Court to invalidate the entire Agreement if this "Individual Claims Only" clause is found to be unenforceable, which it is. ER 126.

Courts interpreting 'poison pill' provisions in similar cases have uniformly found that they render the arbitration agreements containing them null and void. See *Mejia*, 54 Cal.App.5th at 705 ("The clear import of the poison pill, then, is the parties intend to forfeit arbitration entirely if class, representative, or collective claims (*and relief*) are exempted from the reach of the arbitration provision and allowed to be tried in court.") (emphasis added); *see also, McArdle v. AT&T Mobility, LLC*, 2017 WL 4354998, at *5 (N.D. Cal. 2017), *aff'd,* 772 Fed.Appx. 575 (9th Cir. 2019) ("The language of the 'poison pill' sentence unambiguously provides that 'the entirety of this arbitration provision shall be null and void' if subsection 2.2(6), waiving claims and relief on behalf of other persons, is found to be unenforceable.).

This section also restricts the right of the Court to sever this provision from the rest of the Agreement. ER 126. The intent of this language is unambiguous and shows that AmEx clearly wanted to forego arbitration if it could not limit employees' statutory rights and relief. AmEx should be granted the result it desired: to invalidate the Agreement as to Netzel, Larson, and Smith, and adjudicate their claims in court.

### E. The District Court Erred in Holding the Agreement is Not Procedurally Unconscionable

#### 1. California law governs the interpretation of the Agreement for Netzel and Smith

In addition to being invalid under the *McGill* rule, the Agreement is unenforceable against Plaintiffs because it is unconscionable. "Generally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening" the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 682 (1996).

Here, as above, California contract law governs because applying New York law would restrict Plaintiffs from vindicating important substantive rights, i.e., public injunctive relief, that represent a fundamental policy of California. See *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal.App.4th 227, 251-252 (2015) (rejecting as unconscionable Texas choice of law provision which would require plaintiffs to waive important statutory rights under California law). Further, New York law conflicts with California's fundamental policies regarding the enforcement of unconscionable agreements. *Douglas v. U.S. Dist. Court for Cent. Dist. of*

*California*, 495 F.3d 1062, 1067–1068 (9th Cir. 2007) (recognizing New York's more restrictive approach to unconscionability defenses).

Under California law, only contracts that are both procedurally and substantively unconscionable are presumed invalid. *OTO, L.L.C. v. Kho*, 8 Cal.5th 111, 125 (2019). "A procedural unconscionability analysis begins with an inquiry into whether the contract is one of adhesion. An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power on a take-it-or-leave-it basis." *Id.* at 126 (cleaned up). A finding that a contract is one of adhesion is tantamount to a finding of procedural unconscionability. *Cabatit v. Sunnova Energy Corp.*, 60 Cal.App.5th 317, 323 (2020).

Here, the arbitration agreement is a pre-printed form that is handed to new employees on a take-it-or-leave-it basis as a condition of employment. See ER 117, 123-135. The Agreement is roughly 12 pages long, single-spaced, and in a small font. AmEx has no written policy regarding how the Agreement is to be presented to new hires. See ER 102. There is no policy instructing managers about how to present the Agreement; to give employees adequate time to review it or to seek legal counsel; to notify them about the significant rights they are waiving by accepting arbitration as a condition of employment; or for providing employees with a copy of the Agreement. See ER 103-104.

Indeed, knowing that some employees might reject its coercive contract, AmEx employs pressure or diversion to obtain signatures. "Where an employee is induced to sign an arbitration agreement through 'sharp practices' and surprise the consent rationale carries less force." *OTO*, 8 Cal.5th at 129.

### a. AmEx obtained Netzel's signature on the Agreement using sharp practices

When examining a lower court's decision to grant or deny a motion to compel arbitration, this Court reviews the district court's factual findings for clear error. *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1200 (9th Cir. 2021). Here, the district court erred in finding that Netzel and Langkamp had an opportunity to review the Agreement before their employment with AmEx and that, therefore, there was no procedural unconscionability. In support of its ruling, the district court made a factual finding that, "[e]ven if the arbitration agreement was layered into a stack of dozens of onboarding documents, Netzel and Langkamp had prior notice that their employment was conditional on their assent to the arbitration agreement." ER 12. However, this is belied by the evidence submitted by Plaintiffs, which was not disputed by AmEx.

The only evidence supporting the district court's conclusion that Mr. Netzel had notice of AmEx's arbitration policy prior to his employment is an offer letter dated April 9, 2010 that is purportedly addressed to him. However, this letter—on its face—contradicts the court's finding. First, although the letter was ostensibly

dated April 9, 2010, the undisputed evidence shows that Mr. Netzel was not given this letter, or AmEx's ultimatum regarding arbitration, until he was rushed into signing a stack of onboarding documents his first day on the job, May 3, 2010— which is also the date the letter was signed. Second, the letter does not include Mr. Netzel's address, indicating it was never mailed to him. Third, AmEx presented no evidence that it mailed the letter to Mr. Netzel or otherwise delivered it to him at any point before including it in the stack of documents on his first day.

Conversely, Mr. Netzel denies that the letter was delivered to him before his first day at AmEx and declares that it was likely slipped in with his other onboarding paperwork, including the arbitration policy. Mr. Netzel also describes in detail how his manager gave him less than five minutes to sign the entire stack of documents without allowing him to review or retain a copy of any of it, much less seek legal counsel. Since this is the only affirmative evidence on the issue, the district court's conclusion was clear error. AmEx's "sharp practices" in obtaining Mr. Netzel's signature on an adhesive arbitration agreement constitute procedural unconscionability. See *OTO*, 8 Cal.5th at 129.

### b. AmEx sandbagged Smith with arbitration only after he committed to relocating across the country

The district court similarly erred in holding that the Agreement, with respect to Mr. Smith, was not procedurally unconscionable under California law. AmEx concedes that the pre-printed arbitration agreement Mr. Smith was required to accept

as a condition of employment was presented to him on a take-it-or-leave-it basis. See ER 117. This was true for all new employees at the time. See *id.*

AmEx was also indisputably the party with superior bargaining strength in the transaction. Mr. Smith was required to go through AmEx's entire interview process and commit to relocating from Chicago to Phoenix before AmEx sprung its non-negotiable arbitration policy on him, while simultaneously dangling the prospect of employment and the chance to provide for his family. See ER 77. This is sufficient to declare the Agreement procedurally unconscionable as to Mr. Smith as well. *OTO*, 8 Cal.5th at 129.

### 2. The Agreement is procedurally unconscionable even under New York law

A procedural unconscionability analysis under New York law with respect to the Agreement, and how AmEx presented it to Plaintiffs, still leads to the same conclusion. Like California, New York requires procedural and substantive elements of unconscionability to invalidate a contract. See *Brennan v. Bally Total Fitness*, 198 F.Supp.2d 377, 382 (S.D.N.Y. 2002).

Contracts of adhesion are also closely scrutinized for unfairness and power imbalances between the parties. "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997).

The courts will also look for "evidence of high pressure or deceptive tactics" to determine whether they should invalidate an agreement. *Brennan*, 198 F.Supp.2d at 382.

AmEx's tactic of slipping its arbitration agreement into a stack of onboarding documents that it pressures new hires to sign in a short period of time was also used on Mr. Langkamp. On his first day of work, in the middle of trainings, Mr. Langkamp was told by a superior to just click through documents and sign them because he would not get his commissions until he did. AmEx's own documents show that Mr. Langkamp had to review 51 pages in less than seven minutes and return to work. See ER 96.

Unable to refute this evidence, AmEx attempts to introduce Mr. Langkamp's employment application that it claims gave Mr. Langkamp notice that he would be subject to AmEx's arbitration policy. But this notice further illustrates AmEx's efforts to conceal its deprivation of employees' rights. The notice that Mr. Langkamp would be subject to arbitration is buried in a mountain of fine print in an 'agreement' that he purportedly signed as part of his job application See ER 41; *see also, Brennan*, 198 F.Supp.2d at 382 ("the use of fine print in the contract" is an indicator of unconscionability). To think that a prospective employee would read nine paragraphs in tiny, illegible font—before even being offered an interview—while simultaneously submitting countless job applications to potential employers, is

unrealistic to say the least.

Further, Mr. Langkamp was not given an offer letter or anything else indicating that he would be subject to arbitration before accepting the job at AmEx. ER 81. Once he had already accepted the position and started working, he was pressured into quickly signing dozens of documents so he could start earning a salary. This is the type of corporate conduct the doctrine of unconscionability aims to prevent. See *Brennan*, 198 F.Supp.2d at 383. (agreement unconscionable under New York law where employer "gave the employees no more than fifteen minutes to review a sixteen-page single-spaced document, and never mentioned or suggested that the employees could review the Agreement at home or with an attorney").

Mr. Netzel's experience with his manager's high-pressure tactics, with no prior notice that he would be subject to arbitration as a condition of employment, has been detailed above. All of the circumstances surrounding Mr. Netzel's signature on the Agreement indicate he had no "meaningful choice in deciding whether to sign the contract." *Brennan*, 198 F.Supp.2d at 382 (cleaned up). The threshold for finding procedural unconscionability under New York law in his case has therefore also been met.

As described, above, Mr. Smith also did not have a meaningful choice with respect to AmEx's forced arbitration policy. He committed himself to AmEx's complete interview process and relocating from Chicago to Phoenix when he was

finally given a document stating that he could either accept AmEx's arbitration provision or have to start the job-seeking process all over again, with a different company, while being unable to provide for his family. The unfairness and power imbalance in such a scenario has all the markers of procedural unconscionability. *Klos*, 133 F.3d at 168.

### F.     The Agreement is Substantively Unconscionable

Plaintiffs have established that the circumstances under which AmEx forced them into accepting the arbitration policy were procedurally unconscionable. The terms of the Agreement itself tilt the playing field heavily in AmEx's favor. This makes the Agreement substantively unconscionable under both California and New York law.

Courts typically employ a sliding scale evaluation in determining whether an agreement is, overall, unconscionable. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 114 (2000). When an arbitration agreement shows a "systematic effort to impose arbitration on [the weaker party] not simply as an alternative to litigation, but as an inferior forum that works to the [drafter's] advantage," it will not be enforced. *Id.* at 124; *see also, Brennan*, 198 F.Supp.2d at 382 ("[a] contract is substantively unconscionable where

its terms are unreasonably favorable to the party against whom unconscionability is claimed.").

Systematic illegality can be proven if an agreement has multiple unconscionable terms; two or more such provisions will invalidate a contract nearly every single time. *See Ali v. Daylight Transp., LLC*, 59 Cal.App.5th 462, 482 (2020) (three substantively unconscionable terms); *see also Baxter v. Genworth North Am. Corp.* 16 Cal.App.5th 713, 737–738 (2017) (same); *see also Brennan*, 198 F.Supp.2d at 384 (two unconscionable terms sufficient to invalidate agreement).

### 1. The Agreement is illusory because it allows AmEx to unilaterally change its terms

The Agreement includes a unilateral modification clause that gives AmEx the right to change it at any time. The provision states: "American Express reserves the right to alter, amend, modify, or revoke this Policy with notice to employees, except that all Demands filed with the Company at the time such written notice issues shall be subject to the Policy then in effect." ER 134-135. This clause allows AmEx to change the terms of its agreement with employees without any additional consideration. Such unilateral modification provisions are substantively unconscionable in New York because they unreasonably favor employers. *See Brennan*, 198 F.Supp.2d at 384.

In California, there is a split of authority as to whether such terms are unconscionable because the covenant of good faith and fair dealing presumably

limits AmEx's ability to change the terms. *See Lyons v. NBCUniversal Media, LLC*, 2019 WL 6703396, at *10 (C.D. Cal. 2019) (compiling cases). However, the clause here allows AmEx to change the policy for claims that have accrued or that are known to the company so long as employees have not filed demands with the company under the policy. "[I]f a claim has accrued or if the employer knows about a claim, all parties to the Agreement should be bound by the version in effect at that time." *Id.* (quoting *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1459 (2012)). AmEx's agreement allows it to change the terms after employees' claims have accrued. Therefore, "the implied covenant of good faith and fair dealing cannot save [AmEx's] unilateral modification provision because the implied covenant cannot alter the express language of the arbitration agreement." *Id.* The agreement to arbitrate is thus illusory and unconscionable.

### 2. AmEx gives itself the exclusive right to avoid adjudication of claims in *any* forum

A more disturbing provision allows AmEx to unilaterally control access to the arbitral forum in the first place. Unlike standard employer-crafted arbitration agreements which at least allow employees to initiate the process independently, the one devised by AmEx requires everything to go through the company. Employees must fill out and submit a form drafted by AmEx with a "filing fee" and proof of exhaustion of administrative remedies. The agreement specifies that "[a]ny Demand received by the Company which is not accompanied by the required filing fee and

proof of exhaustion of administrative remedies, as applicable, will not be accepted and will be returned to you." ER 127. Another clause states that the "Demand must be received within the time period allowed pursuant to the statute, regulation, or other law applicable to the alleged act or omission giving rise to the dispute." ER 127-128.

In other words, AmEx denies employees access to the courts against their will and then gives itself the power to deny them access to the only dispute-resolution forum allowed by the Agreement. This is indisputably oppressive and unlawful. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").

A New York district court examined a similar provision in a union collective bargaining agreement specifying that the union, and not the employee, would decide whether to arbitrate her claims. *Morris v. Temco Serv. Indus., Inc.*, 2010 WL 3291810, at *5 (S.D.N.Y. 2010). Finding that the union failed to uphold the plaintiff's statutory rights, the court held the agreement unenforceable. *Id.* Other courts, analyzing arbitrary gatekeeping of an employee's claims, have come to the same conclusion. *See Drake v. Hyundai Rotem USA, Corp.*, 2013 WL 4551228, at

*5 (E.D. Pa. 2013); *see also de Souza Silva v. Pioneer Janitorial Servs., Inc.*, 777 F.Supp.2d 198, 206 (D. Mass. 2011).

Finally, the administrative remedy exhaustion requirement creates an impermissible hurdle that is antithetical to the idea that arbitration is a more speedy and efficient method of resolving disputes. Title VII "imposes this exhaustion requirement only for litigation in federal court and does not implicate private arbitration agreements." *Morris,* 2010 WL 3291810, at *5; *see also CACI Premier Tech., Inc. v. Faraci*, 464 F.Supp.2d 527, 533 (E.D. Va. 2006) ("nothing in Title VII suggests that exhaustion is required when parties contract to arbitrate their Title VII dispute"). This unnecessary requirement exists to deprive employees of substantive rights and is, therefore, unconscionable.

### 3.    The confidentiality clause heavily favors AmEx

There is a confidentiality provision in the Agreement which specifies that "[a]ll proceedings under this Policy are private and confidential." ER 129. This overly broad confidentiality clause cloaks cases against AmEx in secrecy and illustrates why, in contrast, there is a strong public policy favoring open court proceedings. This Court has cautioned that provisions such as this "favor companies over individuals." *Ting v. AT&T*, 319 F.3d 1126, 1151 (9th Cir. 2003). The reasons for this are obvious, especially in cases where the parties have vastly different levels of resources. Where the allegations involve companywide policies, it is a Herculean

task for dispersed employees to collect data and information—expending resources and duplicating efforts multiple times over—while the employer has all the relevant information at its fingertips.

Additionally, AmEx mandates all cases to be arbitrated with the American Arbitration Association ("AAA"). This exclusive provider requirement means that, as a repeat player, AmEx brings a significant amount of business to AAA and its arbitrators. The implications inherent in such a profitable arrangement are self-evident. *See Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130, 1138 (9th Cir. 2019) (citing study "finding that employees disproportionately failed to recover damages against repeat-player employers compared to non-repeat-player employers"). The repeat player advantage allows employers to collect "a wealth of knowledge" on arbitrators and case results while preventing "potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination against [the employer]." *Ting*, 319 F.3d at 1151–1152; *see also, Ramos v. Superior Court*, 28 Cal.App.5th 1042 (2018).[4]

---

[4] The California Supreme Court also criticized the repeat player effect in *Armendariz*. 24 Cal.4th at 115 ("Various studies show that arbitration is advantageous to employers not only because it reduces the costs of litigation, but also because it reduces the size of the award that an employee is likely to get, particularly if the employer is a 'repeat player' in the arbitration system. It is perhaps for this reason that it is almost invariably the employer who seeks to compel arbitration.") (cleaned up).

Recent cases applying California law have held that confidentiality clauses like the one in this case are substantively unconscionable. See*, e.g.*, *Ramos*, 28 Cal.App.5th at 1065 (holding that confidentiality clause applying to "all aspects of the arbitration" is unconscionable); *see also, Storms v. Paychex, Inc.*, 2022 WL 2160414, at *15 (C.D. Cal. 2022) ("the arbitration shall be conducted confidentially, and all parties shall agree to maintain the confidentiality of all matters related thereto."). AmEx's confidentiality clause, in conjunction with the class action waiver, is simply a governor on Plaintiffs' information-gathering capabilities inserted to give AmEx an unfair advantage.

### 4. The Agreement is permeated with illegality and cannot be enforced

"If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced." *Armendariz,* 24 Cal.4th at 124. The Agreement contains at least four unconscionable provisions: (1) the prohibition on injunctive relief; (2) the confidentiality clause; (3) the gatekeeping provision; and (4) the non-mutuality clause. This, coupled with a high level of procedural unconscionability, only leads to one conclusion: AmEx has implemented "a systematic effort to impose arbitration . . . not simply as an alternative to litigation, but as an inferior forum that works to [the company's] advantage." *Id.* The Agreement must be declared unconscionable and void.

## IX.  CONCLUSION

Plaintiffs request that the district court's ruling ordering Plaintiffs' claims to arbitration be reversed with directions that this case proceed in the district court on all claims pled in the SAC.


Dated:  November 8, 2023          THE PIVTORAK LAW FIRM
                                  DAVID PIVTORAK (CSB 255943)


                                  By:         /s/  David Pivtorak
                                  _____
                                          DAVID PIVTORAK

                                  611 Wilshire Boulevard, Suite 911
                                  Los Angeles, CA 90017
                                  Telephone: (213) 291-9130
                                  Facsimile:  (877) 748-4529
                                  david@piv4law.com

                                  Aaron T. Martin (AZ Bar No. 028358)
                                  MARTIN LAW & MEDIATION PLLC
                                  2415 East Camelback, Suite 700
                                  Phoenix, AZ 85016
                                  Telephone: (602) 812-2680
                                  Facsimile: (602) 508-6099
                                  aaron@martinlawandmediation.com

**CERTIFICATE OF COMPLIANCE**
**FED. R. APP. 32(a)(7)(C) AND CIRCUIT RULE 32-1**

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that the attached brief is proportionately spaced, has a typeface of 14 points,

and contains 10,744 words according to the Microsoft Word counting function.


Dated: November 8, 2023          By:         /s/ David Pivtorak

                                         DAVID PIVTORAK

# ADDENDUM

# Table of Contents

**Statutes**

Cal. Gov. Code § 12920...........................................................................A-1

**Other Authorities**

Restatement (Second) of Conflict of Laws § 1987............................................A-3

Restatement (Second) of Conflict of Laws § 1988..........................................A-14

West's Annotated California Codes
    Government Code (Refs & Annos)
        Title 2. Government of the State of California
            Division 3. Executive Department (Refs & Annos)
                Part 2.8. Civil Rights Department (Refs & Annos)
                    Chapter 3. Findings and Declarations of Policy (Refs & Annos)

West's Ann.Cal.Gov.Code § 12920

§ 12920. Public policy; discrimination in employment
rights and opportunities and housing; purpose; police power

Effective: January 1, 2023
Currentness

It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, reproductive health decisionmaking, or military and veteran status.

It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for these reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general.

Further, the practice of discrimination because of race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, veteran or military status, or genetic information in housing accommodations is declared to be against public policy.

It is the purpose of this part to provide effective remedies that will eliminate these discriminatory practices.

This part shall be deemed an exercise of the police power of the state for the protection of the welfare, health, and peace of the people of this state.

**A-1**

**Credits**

(Added by Stats.1980, c. 992, § 4. Amended by Stats.1992, c. 182 (S.B.1234), § 2; Stats.1992, c. 912 (A.B.1286), § 1; Stats.1992, c. 913 (A.B.1077), § 19; Stats.1999, c. 592 (A.B.1001), § 1.5; Stats.2010, c. 524 (S.B.1252), § 4; Stats.2011, c. 261 (S.B.559), § 7; Stats.2011, c. 719 (A.B.887), § 12.5; Stats.2013, c. 691 (A.B.556), § 1; Stats.2019, c. 601 (S.B.222), § 2, eff. Jan. 1, 2020; Stats.2022, c. 630 (S.B.523), § 3, eff. Jan. 1, 2023.)

Notes of Decisions (115)

West's Ann. Cal. Gov. Code § 12920, CA GOVT § 12920
Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 888 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-2**

Restatement of the Law, Conflict of Laws 2d - Official Text > Chapter 8- Contracts > Topic 1- Validity of Contracts and Rights Created Thereby > Title A- General Principles

## § 187 Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

### COMMENTS & ILLUSTRATIONS

Comment:

a. Scope of Section. The rule of this Section is applicable only in situations where it is established to the satisfaction of the forum that the parties have chosen the state of the applicable law. When the parties have made such a choice, they will usually refer expressly to the state of the chosen law in their

contract, and this is the best way of insuring that their desires will be given effect. But even when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied. So the fact that the contract contains legal expressions, or makes reference to legal doctrines, that are peculiar to the local law of a particular state may provide persuasive evidence that the parties wished to have this law applied.

On the other hand, the rule of this Section is inapplicable unless it can be established that the parties have chosen the state of the applicable law. It does not suffice to demonstrate that the parties, if they had thought about the matter, would have wished to have the law of a particular state applied.

Illustration:1. A contract, by its terms to be performed in state Y, is entered into in state X between A, a domiciliary of X, and B, a domiciliary of Y. The contract recites that the parties "waive restitution in integrum in case of laesio enormis." These notions are foreign to X local law. They exist, on the other hand, in Y local law which furthermore empowers the parties to waive such right of restitution. A court could properly find on these facts that the parties wished to have Y local law applied.

Comment:

b. Impropriety or mistake. A choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake. Whether such consent was in fact obtained by improper means or by mistake will be determined by the forum in accordance with its own legal principles. A factor which the forum may consider is whether the choice-of-law provision is contained in an "adhesion" contract, namely one that is drafted unilaterally by the dominant party and then presented on a "take-it-or-leave-it" basis to the weaker party who has no real opportunity to bargain about its terms. Such contracts are usually prepared in printed form, and frequently at least some of their provisions are in extremely small print. Common examples are tickets of various kinds and insurance policies. Choice-of-law provisions contained in such contracts are usually respected. Nevertheless, the forum will scrutinize such contracts with care and will refuse to apply any choice-of-law provision they may contain if to do so would result in substantial injustice to the adherent.

Illustrations:2. A presents to B for signature a contract which embodies the terms of their prior agreement but which also provides that the rights of the parties under the contract shall be governed by the law of state X. A does not wish B to know of the provision calling for application of X law and therefore says that there is no reason for B to read the contract since it does no more than set forth their earlier agreement. B signs the contract without reading it in reliance upon A's word. The forum will not give effect to the provision calling for application of X law.

3. In state X, A buys from the B company a ticket on one of B's steamships for transportation from X to state Y. The ticket recites that it shall be governed by Y law and also contains a provision stating that B shall not be liable for injuries resulting from the negligence of its servants. The latter provision is valid under Y local law, but invalid under that of X. In the course of the voyage, A is injured through the negligence of B's servants. A brings suit to recover for his injuries against B in state Z. In determining whether or not to give effect to the choice-of-law provision, the Z court will give consideration to the fact that the contract was drafted unilaterally by B, the dominant party, and then presented to A on a "take-it-or-leave-it" basis.

Comment on Subsection (1):

c. Issues the parties could have determined by explicit agreement directed to particular issue. The rule of this Subsection is a rule providing for incorporation by reference and is not a rule of choice of law. The parties, generally speaking, have power to determine the terms of their contractual engagements. They may spell out these terms in the contract. In the alternative, they may incorporate into the contract by reference extrinsic material which may, among other things, be the provisions of some foreign law. In such instances, the forum will apply the applicable provisions of the law of the designated state in order to effectuate the intentions of the parties. So much has never been doubted. The point deserves emphasis nevertheless because most rules of contract law are designed to fill gaps in a contract which the parties could themselves have filled with express provisions. This is generally true, for example, of rules relating to construction, to conditions precedent and subsequent, to sufficiency of performance and to excuse for nonperformance, including questions of frustration and impossibility. As to all such matters, the forum will apply the provisions of the chosen law.

Whether the parties could have determined a particular issue by explicit agreement directed to that issue is a question to be determined by the local law of the state selected by application of the rule of § 188. Usually, however, this will be a question that would be decided the same way by the relevant local law rules of all the potentially interested states. On such occasions, there is no need for the forum to determine the state of the applicable law.

Illustrations:4. In state X, A establishes a trust and provides that B, the trustee, shall be paid commissions at the highest rate permissible under the local law of state Y. A and B are both domiciled in X, and the trust has no relation to any state but X. In X, the highest permissible rate of commissions for trustees is 5 per cent. In Y, the highest permissible rate is 4 per cent. The choice-of-law provision will be given effect, and B will be held entitled to commissions at the rate of 4 per cent.

5. Same facts as in Illustration 4 except that the highest permissible rate of commissions in X is 4 per cent and in Y is 5 per cent. Effect will not be given to the choice-of-law provision since under X local law the parties lacked power to provide for a rate of commissions in excess of 4 per cent and Y, the state of the chosen law, has no relation to the parties or the trust.

Comment on Subsection (2):

d. Issues the parties could not have determined by explicit agreement directed to particular issue. The rule of this Subsection applies only when two or more states have an interest in the determination of the particular issue. The rule does not apply when all contacts are located in a single state and when, as a consequence, there is only one interested state. Subject to this qualification, the rule of this Subsection applies when it is sought to have the chosen law determine issues which the parties could not have determined by explicit agreement directed to the particular issue. Examples of such questions are those involving capacity, formalities and substantial validity. A person cannot vest himself with contractual capacity by stating in the contract that he has such capacity. He cannot dispense with formal requirements, such as that of a writing, by agreeing with the other party that the contract shall be binding without them. Nor can he by a similar device avoid issues of substantial validity, such as whether the contract is illegal. Usually, however, the local law of the state chosen by the parties will be applied to regulate matters of this sort. And it will usually be applied even when to do so would

require disregard of some local provision of the state which would otherwise be the state of the applicable law.

Permitting the parties in the usual case to choose the applicable law is not, of course, tantamount to giving them complete freedom to contract as they will. Their power to choose the applicable law is subject to the two qualifications set forth in this Subsection (see Comments f-g).

e. Rationale. Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby. In this way, certainty and predictability of result are most likely to be secured. Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations.

An objection sometimes made in the past was that to give the parties this power of choice would be tantamount to making legislators of them. It was argued that, since it is for the law to determine the validity of a contract, the parties may have no effective voice in the choice of law governing validity unless there has been an actual delegation to them of legislative power. This view is now obsolete and, in any event, falls wide of the mark. The forum in each case selects the applicable law by application of its own choice-of-law rules. There is nothing to prevent the forum from employing a choice-of-law rule which provides that, subject to stated exceptions, the law of the state chosen by the parties shall be applied to determine the validity of a contract and the rights created thereby. The law of the state chosen by the parties is applied, not because the parties themselves are legislators, but simply because this is the result demanded by the choice-of-law rule of the forum.

It may likewise be objected that, if given this power of choice, the parties will be enabled to escape prohibitions prevailing in the state which would otherwise be the state of the applicable law. Nevertheless, the demands of certainty, predictability and convenience dictate that, subject to some limitations, the parties should have power to choose the applicable law.

On occasion, the parties may choose a law that would declare the contract invalid. In such situations, the chosen law will not be applied by reason of the parties' choice. To do so would defeat the

expectations of the parties which it is the purpose of the present rule to protect. The parties can be assumed to have intended that the provisions of the contract would be binding upon them (cf. § 188, Comment b). If the parties have chosen a law that would invalidate the contract, it can be assumed that they did so by mistake. If, however, the chosen law is that of the state of the otherwise applicable law under the rule of § 188, this law will be applied even when it invalidates the contract. Such application will be by reason of the rule of § 188, and not by reason of the fact that this was the law chosen by the parties.

Illustrations:6. In state X, P and D initial an agreement which calls for performance in state Y. The contract states that the rights of the parties thereunder shall bedetermined by Y law. In X, P sues D for breach of the contract, and D defends on the ground that the contract is void under the X statute of frauds, since it was not signed by him. The contract, however, is valid under Y local law. The X court will find for P.

7. H and W, husband and wife, are domiciled in state X. In state Y, W enters into a contract with C, who is domiciled and doing business in that state, in which C agrees to sell goods to H on credit in return for a guaranty from W in the amount of $ 1,000.00. The contract recites that it shall be governed by X law. Under the local law of X, married women have full contractual capacity. Under the local law of Y, however, they lack capacity to bind themselves as sureties for their husbands. In an action by C against W, the contract will not be held invalid for lack of contractual capacity on the part of W.

8. A executes and delivers to B in state X an instrument in which A agrees to indemnify B against all losses arising from B's liability on a certain appeal bond on behalf of C, against whom a judgment has been rendered in state Y. The instrument recites that it shall be governed by the law of Y. The instrument is valid and enforceable under the local law of Y but is unenforceable for lack of consideration under the local law of X. In an action by B against A, the instrument will not be held invalid for lack of consideration.

Comment:

f. Requirement of reasonable basis for parties' choice. The forum will not apply the chosen law to determine issues the parties could not have determined by explicit agreement directed to the particular

issue if the parties had no reasonable basis for choosingthis law. The forum will not, for example, apply a foreign law which has been chosen by the parties in the spirit of adventure or to provide mental exercise for the judge. Situations of this sort do not arise in practice. Contracts are entered into for serious purposes and rarely, if ever, will the parties choose a law without good reason for doing so.

When the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice. This will be the case, for example, when this state is that where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties. These situations are mentioned only for purposes of example. There are undoubtedly still other situations where the state of the chosen law will have a sufficiently close relationship to the parties and the contract to make the parties' choice reasonable.

The parties to a multistate contract may have a reasonable basis for choosing a state with which the contract has no substantial relationship. For example, when contracting in countries whose legal systems are strange to them as well as relatively immature, the parties should be able to choose a law on the ground that they know it well and that it is sufficiently developed. For only in this way can they be sure of knowing accurately the extent of their rights and duties under the contract. So parties to a contract for the transportation of goods by sea between two countries with relatively undeveloped legal systems should be permitted to submit their contract to some well-known and highly elaborated commercial law.

g. When application of chosen law would be contrary to fundamental policy of state of otherwise applicable law. Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation. The chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties. The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law. Application of the chosen

law will be refused only (1) to protect a fundamental policy of the state which, under the rule of § 188, would be the state of the otherwise applicable law, provided (2) that this state has a materially greater interest than the state of the chosen law in the determination of the particular issue. The forum will apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present rule and whether the other state has a materially greater interest than the state of the chosen law in the determination of the particular issue. The parties' power to choose the applicable law is subject to least restriction in situations where the significant contacts are so widely dispersed that determination of the state of the applicable law without regard to the parties' choice would present real difficulties.

No detailed statement can be made of the situations where a "fundamental" policy of the state of the otherwise applicable law will be found to exist. An important consideration is the extent to which the significant contacts are grouped in this state. For the forum will be more inclined to defer to the policy of a state which is closely related to the contract and the parties than to the policy of a state where few contacts are grouped but which, because of the wide dispersion of contacts among several states, would be the state of the applicable law if effect were to be denied the choice-of-law provision. Another important consideration is the extent to which the significant contacts are grouped in the state of the chosen law. The more closely this state is related to the contract and to the parties, the more likely it is that the choice-of-law provision will be given effect. The more closely the state of the chosen law is related to the contract and the parties, the more fundamental must be the policy of the state of the otherwise applicable law to justify denying effect to the choice-of-law provision.

To be "fundamental," a policy must in any event be a substantial one. Except perhaps in the case of contracts relating to wills, a policy of this sort will rarely be found in a requirement, such as the statute of frauds, that relates to formalities (see Illustration 6). Nor is such policy likely to be represented by a rule tending to become obsolete, such as a rule concerned with the capacity of married women (see Illustration 7), or by general rules of contract law, such as those concerned with the need for consideration (see Illustration 8). On the other hand, a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power. Statutes involving the rights of an individual

insured as against an insurance company are an example of this sort (see §§ 192-193). To be "fundamental" within the meaning of the present rule, a policy need not be as strong as would be required to justify the forum in refusing to entertain suit upon a foreign cause of action under the rule of § 90.

Illustrations:9. In state X, A and B, who are both domiciled in that state, negotiate the terms of a contract which is to be performed in X. The contract provides that it shall be governed by the law of state Y; it is signed first by A in X and then by B in Y. A suit involving the validity of the contract is brought before a court of state Z. The court will be more inclined to deny effect to the choice-of-law provision in deference to X policy than it would have been if the elements had not been massed to so great an extent in X.

10. In state X, the A insurance company issues a life insurance policy insuring the life of B. A is incorporated and has its "home office" in X while B is domiciled in state Y. The policy contains a provision stating that the rights of the parties thereunder shall be determined by X law. In his application for the policy, given by B to A's agent in Y, B made a misstatement which under the local law of X would serve as a complete defense to the insurer in a suit on the policy, but would not have this effect under a statute of Y. B brings suit on the policy in a court in state Z. Under the rule of § 192, Y is the state whose local law would govern the validity of the contract in the absence of an effective choice of law by the parties. The Z court will deny effect to the choice-of-law provision.

Comment on Subsection (3):

h. Reference is to "local law" of chosen state. The reference, in the absence of a contrary indication of intention, is to the "local law" of the chosen state and not to that state's "law," which means the totality of its law including its choice-of-law rules. When they choose the state which is to furnish the law governing the validity of their contract, the parties almost certainly have the "local law," rather than the "law," of that state in mind (compare § 186, Comment b). To apply the "law" of the chosen state would introduce the uncertainties of choice of law into the proceedings and would serve to defeat the basic objectives, namely those of certainty and predictability, which the choice-of-law provision was designed to achieve.

i. Choice of two or more laws. Subject to the limitations imposed by the rule of this Section, the parties may choose to have different issues involving their contract governed by the local law of different states. The parties' power is unlimited in the case of issues lying within their contractual capacity, i.e., issues that the parties could have resolved by an explicit provision in their agreement directed to that issue. (See Subsection (1) of the rule of this Section.) As to other issues, i.e., issues which the parties could not have resolved by an explicit provision in their agreement, the parties' power to choose to have different issues governed by the local law of different states is subject to the limitations imposed by Subsection (2) of the rule.

### REPORTER'S NOTES

*Changes:* The only change is to Comment *i*, which has been revised to make clear that the parties may elect to have different laws govern different issues in the contract.

*Comment i:* The power of the parties to choose to have different issues in their contract governed by different laws follows from the fact that in this country and under the rules of this Restatement questions of choice of law depend upon the particular issue and may vary from issue to issue.

A case directly in point is Kronovet v. Lipchin, 288 Md. 30, 415 A.2d 1096 (1980), where the court gave effect to a choice-of-law provision calling for application of Maryland law to the issue of usury and of New York law to the remaining aspects of the contract.

There are a number of cases giving effect to a choice-of-law provision providing that the validity of an arbitration clause should be determined by the local law of a state which was not the state whose local law would govern other aspects of the contract. See, e.g., Joseph L. Wilmotte & Co. v. Rosen Bros., 258 N.W.2d 317 (Iowa 1977); Application of Electronic & Missile Facilities, Inc., 38 Misc.2d 423, 236 N.Y.S.2d 594 (1962); Hamlyn & Co. v. Talisker Distillery, 1894 A.C. 202. See also 18 Am.Jur. Legal Forms 2d, UCC § 253:34, which expressly permits the parties to choose to have different issues governed by the different local law rules of different states. Cf. Shannon v. Irving Trust Co., 275 N.Y. 95, 9 N.E.2d 792 (1937) (court gave effect to a provision in an inter vivos trust that the local law of New York should be applied to determine trustee commissions while other issues should be governed by the local law of New Jersey.)

The power of the parties to choose to have different issues in their contract governed by the law of different states is well recognized in Europe. For example, the European Communities Convention on the Law Applicable to Contractual Obligations provides in Article 3: "By their choice the parties can select the law applicable to the whole, or a part only, of the contract." See also Blom, Choice of Law Methods in the Private International Law of Contracts, 16 Can.Y.B. of Int.L. 230, 260 (1978); Drobnig, American-German Private International Law, 228 (2d ed. 1972); Kegel, Internationales Privatrecht 291 (4th ed. 1977); Lagarde, The European Convention on the Law Applicable to Contractual Obligations: An Apologia, 22 Va.J.Int.L. 91, 96 (1981); Lagarde, Le Depecage dans le Droit International Prive des Contrats, 11 Rivista di Diritto Internazionale Private e Processuale 649, 652 (1975).

Restatement of the Law, Second, Conflict of Laws (1988 Revisions)

Copyright (c) 1988, The American Law Institute

Restatement of the Law, Conflict of Laws 2d - Official Text  >  Chapter 8- Contracts  >  Topic 1- Validity of Contracts and Rights Created Thereby  >  Title A- General Principles

## § 188 Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a) the place of contracting,

    (b) the place of negotiation of the contract,

    (c) the place of performance,

    (d) the location of the subject matter of the contract, and

    (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

    COMMENTS & ILLUSTRATIONS

**Comment:**

*a. Scope of section*. The rule of this Section applies in all situations where there has not been an effective choice of the applicable law by the parties (see § 187).

**Comment on Subsection (1):**

*b. Rationale*. The principles stated in § 6 underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the transaction and the parties. The factors listed in Subsection (2) of the rule of § 6 can be divided into five groups. One group is concerned with the fact that in multistate cases it is essential that the rules of decision promote mutually harmonious and beneficial relationships in the interdependent community, federal or international. The second group focuses upon the purposes, policies, aims and objectives of each of the competing local law rules urged to govern and upon the concern of the potentially interested states in having their rules applied. The factors in this second group are at times referred to as "state interests" or as appertaining to an "interested state." The third group involves the needs of the parties, namely the protection of their justified expectations and certainty and predictability of result. The fourth group is directed to implementation of the basic policy underlying the particular field of law, such as torts or contracts, and the fifth group is concerned with the needs of judicial administration, namely with ease in the determination and application of the law to be applied.

The factors listed in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field and from issue to issue. Thus, the protection of the justified expectations of the parties is of considerable importance in contracts whereas it is of relatively little importance in torts (see § 145, Comment *b*). In the torts area, it is the rare case where the parties give advance thought to the law that may be applied to determine the legal consequences of their actions. On the other hand, parties enter into contracts with forethought and are likely to consult a lawyer before doing so. Sometimes, they will intend that their rights and obligations under the contract should be determined by the local law of a particular state. In this event, the local law of this state will be applied, subject to the qualifications stated in the rule of § 187. In situations where the parties did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be

ascertained, it may at least be said, subject perhaps to rare exceptions, that they expected that the provisions of the contract would be binding upon them.

The need for protecting the expectations of the parties gives importance in turn to the values of certainty, predictability and uniformity of result. For unless these values are attained, the expectations of the parties are likely to be disappointed.

Protection of the justified expectations of the parties by choice-of-law rules in the field of contracts is supported both by those factors in Subsection (2) of § 6 which are directed to the furtherance of the needs of the parties and by those factors which are directed to implementation of the basic policy underlying the particular field of law. Protection of the justified expectations of the parties is the basic policy underlying the field of contracts.

Protection of the justified expectations of the parties is a factor which varies somewhat in importance from issue to issue. As indicated above, this factor is of considerable importance with respect to issues involving the validity of a contract, such as capacity, formalities and substantial validity. Parties entering a contract will expect at the very least, subject perhaps to rare exceptions, that the provisions of the contract will be binding upon them. Their expectations should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied. The extent of the interest of a state in having its rule applied should be determined in the light of the purpose sought to be achieved by the rule and by the relation of the transaction and the parties to that state (see Comment *c*).

Protection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of the obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof. By and large, it is for the parties themselves to determine the nature of their contractual obligations. They can spell out these obligations in the contract or, as a short-hand device, they can provide that these obligations shall be determined by the local law of a given state (see § 187, Comment *c*). If the parties do neither of these two things with respect to an issue involving the nature of their obligations, as, for example, the time

of performance, the resulting gap in their contract must be filled by application of the relevant rule of contract law of a particular state. All states have gap-filling rules of this sort, and indeed such rules comprise the major content of contract law. What is important for present purposes is that a gap in a contract usually results from the fact that the parties never gave thought to the issue involved. In such a situation, the expectations of the parties with respect to that issue are unlikely to be disappointed by application of the gap-filling rule of one state rather than of the rule of another state. Hence with respect to issues of this sort, protection of the justified expectations of the parties is unlikely to play so significant a role in the choice-of-law process. As a result, greater emphasis in fashioning choice-of-law rules in this area must be given to the other choice-of-law principles mentioned in the rule of § 6.

*c. Purpose of contract rule.* The purpose sought to be achieved by the contract rules of the potentially interested states, and the relation of these states to the transaction and the parties, are important factors to be considered in determining the state of most significant relationship. This is because the interest of a state in having its contract rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and upon the relation of the state to the transaction and the parties. So the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power. And a state where a contract provides that a given business practice is to be pursued has an obvious interest in the application of its rule designed to regulate or to deter that business practice. On the other hand, the purpose of a rule and the relation of a state to the transaction and the parties may indicate that the state has little or no interest in the application of that rule in the particular case. So a state may have little interest in the application of a rule designed to protect a party against the unfair use of superior bargaining power if the contract is to be performed in another state which is the domicil of the person seeking the rule'sprotection. And a state may have little interest in the application of a statute designed to regulate or to deter a certain business practice if the conduct complained of is to take place in another state.

Whether an invalidating rule should be applied will depend, among other things, upon whether the interest of the state in having its rule applied to strike down the contract outweighs in the particular

case the value of protecting the justified expectations of the parties and upon whether some other state has a greater interest in the application of its own rule.

Frequently, it will be possible to decide a question of choice of law in contract without paying deliberate attention to the purpose sought to be achieved by the relevant contract rules of the interested states. This will be so whenever by reason of the particular circumstances one state is obviously that of the applicable law.

*d. The issue involved.* The courts have long recognized that they are not bound to decide all issues under the local law of a single state. Thus, in an action on a contract made and to be performed in a foreign state by parties domiciled there, a court under traditional and prevailing practice applies its own state's rules to issues involving process, pleadings, joinder of parties, and the administration of the trial (see Chapter 6), while deciding other issues -- such as whether the defendant had capacity to bind himself by contract -- by reference to the law selected by application of the rules stated in this Chapter. The rule of this Section makes explicit that selective approach to choice of the law governing particular issues.

Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states.

**Comment on Subsection (2):**

*e. Important contacts in determining state of most significant relationship.* In the absence of an effective choice of law by the parties (see § 187), the forum, in applying the principles of § 6 to determine the state of most significant relationship, should give consideration to the relevant policies of all potentially interested states and the relative interests of those states in the decision of the particular issue. The states which are most likely to be interested are those which have one or more of the following contacts with the transaction or the parties. Some of these contacts also figure prominently in the formulation of the applicable rules of choice of law.

*The place of contracting.* As used in the Restatement of this Subject, the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect, assuming, hypothetically, that the local law of the state where the act occurred rendered the contract binding.

**A-18**

Standing alone, the place of contracting is a relatively insignificant contact. To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting. In such situations, however, this state will be the state of the applicable law for reasons additional to the fact that it happens to be the place where occurred the last act necessary to give the contract binding effect. The place of contracting, in other words, rarely stands alone and, almost invariably, is but one of several contacts in the state. Usually, this state will be the state where the parties conducted the negotiations which preceded the making of the contract. Likewise, this state will often be the state of the parties' common domicil as well. By way of contrast, the place of contracting will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract, such as when a letter of acceptance is mailed in a railroad station in the course of an interstate trip.

*The place of negotiation.* The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and in the agreement reached. This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.

*The place of performance.* The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform. So the state where performance is to occur has an obvious interest in the question whether this performance would be illegal (see § 202). When both parties are to perform in the state, this state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance. And this is even more likely to be so if, in addition, both parties are domiciled in the state.

On the other hand, the place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue.

It is clear that the local law of the place of performance will be applied to govern all questions relating to details of performance (see § 206).

*Situs of the subject matter of the contract*.  When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant (see §§ 189-193).  The state where the thing or the risk is located will have a natural interest in transactions affecting it.  Also the parties will regard the location of the thing or of the risk as important.  Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

*Domicil, residence, nationality, place of incorporation, and place of business of the parties*.  These are all places of enduring relationship to the parties.  Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts.  So, for example, when a person has capacity to bind himself to the particular contract under the local law of the state of his domicil, there may be little reason to strike down the contract because that person lacked capacity under the local law of the state of contracting or of performance (see § 198).  The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business.  As stated in § 192, the domicil of the insured is a contact of particular importance in the case of life insurance contracts.  At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state.

llustrations: 1.  A, who is domiciled in state X, is declared a spendthrift by an X court.  Thereafter, A borrows money in state Y from B, a Y domiciliary, who lends the money in ignorance of A's spendthrift status.  Under the terms of the loan, the money is to be repaid in Y.  A does not pay, and B brings suit in state Z.  A would not be liable under X local law because he has been declared a

spendthrift; he would, however, be liable under the local law of Y. The first question for the Z court to determine is whether the interests of both X and Y would be furthered by application of their respective local law rules. This is a question that can only be determined in the light of the respective purposes of these rules (see Comment *c*). The purpose of the X local law rule is obviously to protect X domiciliaries and their families. Hence the interests of X would be furthered by application of the X spendthrift rule. On the other hand, Y's interests would be furthered by the application of its own rule, which presumably was intended for the protection of Y creditors and also to encourage persons to enter into contractual relationships in Y. Since the interests of X and Y would each be furthered by application of their respective rules, the Z court must choose between them. Among the questions for the Z court to determine are whether the value of protecting the justified expectations of the parties and the interest of Y in the application of its rule outweigh X's interest in the application of its invalidating rule. Factors which would support an affirmative answer to this question, and which indicate the degree of Y's interest in the application of its rule, are that A sought out B in Y, that B is domiciled in Y, that the loan was negotiated and made in Y and that the contract called for repayment in Y (see § 195). If it is found that an X court would not have applied its rule to the facts of the present case, the argument for applying the Y rule would be even stronger. For it would then appear that, even in the eyes of the X court, X interests were not sufficiently involved to require application of the X rule (see § 8, Comment *k*).

2. A, a married woman, who is domiciled in state X, comes to state Y and there borrows money from B. The loan contract provides that the money is to be repaid in Y. A does not pay, and B brings suit in state Z. A defends on the ground that under Y local law married women lack capacity to bind themselves by contract; they do have such capacity, however, under the local law of X. It is questionable in this case whether the interests of either X or Y would be furthered by application of their respective rules. Y's rule of incapacity was presumably designed to protect Y married women. On the other hand, X's rule of capacity was presumably designed, at least primarily, to protect X transactions. It seems clear in any event that the value of protecting the justified expectations of the parties is not outweighed in this case by any interest Y may have in the application of its rule of

incapacity. Under the circumstances, the contract should be upheld on the issue of A's capacity by application of the X rule.

**Comment on Subsection (3):**

*f. When place of negotiation and place of performance are in the same state*. When the place of negotiation and the place of performance are in the same state, the local law of this state will usually be applied to govern issues arising under the contract, except as stated in §§ 189-199 and 203. A state having these contacts will usually be the state that has the greatest interest in the determination of issues arising under the contract. The local law of this state should be applied except when the principles stated in § 6 require application of some other law. As stated in Comment *c*, the extent of a state's interest in having its contract rule applied will depend upon the purpose sought to be achieved by that rule.

*g*. For reasons stated in § 186, Comment *b*, the reference is to the "local law" of the state of the applicable law and not to that state's "law" which means the totality of its law including its choice-of-law rules.

*h*. As to the situation where the local law rule of two or more states is the same, see § 186, Comment *c*.

### REPORTER'S NOTES

See Rungee v. Allied Van Lines, Inc., 92 Idaho 718, 449 P.2d 378 (1968) (quoting and applying rule of Section).

See generally Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161-162 (1946) (a case involving the validity of a covenant contained in a mortgage indenture where the Court said: "In determining which contract is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states."); Rutas Aereas Nacionales, S. A. v. Robinson, 339 F.2d 265 (5th Cir. 1964); Whitman v. Green, 289 F.2d 566 (9th Cir. 1961) (note executed in Idaho by Idaho resident and secured by Idaho realty upheld against charge of usury by application of local law of Washington where note was

delivered and payable. "In the case at bar the lender did not seek out the borrower in the State of Idaho, nor sit in wait for him in that state. Rather, the borrower sought out the lender in the State of Washington."); Perrin v. Pearlstein, 314 F.2d 863 (2d Cir. 1963); Teas v. Kimball, 257 F.2d 817, 824 (5th Cir. 1958) (". . . the focus of the contract was so centered in Texas that its validity should be determined by the laws of contract of that state"); Global Commerce Corp. v. Clark-Babbitt Industries, 239 F.2d 716 (2d Cir. 1956); Alaska Airlines, Inc. v. Stephenson, 217 F.2d 295 (9th Cir. 1954); Grace v. Livingstone, 195 F.Supp. 933, 935 (D.Mass.1961), aff'd per curiam 297 F.2d 836 (1962), cert. den. sub. nom. 369 U.S. 871 (1962) ("In the silence of the parties, Massachusetts law governs for reasons well explained in the notes accompanying the April 22, 1960, amendments to the Second Restatement of Conflict of Laws, Tentative Draft No. 6."); Metzenbaum v. Golwynne Chemicals Corp., 159 F.Supp. 648 (S.D.N.Y.1958); Mutual Life Ins. Co. v. Simon, 151 F.Supp. 408 (S.D.N.Y.1957); Fricke v. Isbrandtsen Co., Inc., 151 F.Supp. 465, 467 (S.D.N.Y.1957) ("Ordinarilythe federal courts determine which law governs a contract by 'grouping of contacts' or 'finding the center of gravity' of the contract. The law of the jurisdiction having the closest relation to the contract is selected because, it is felt, the parties contracted probably with that law (if any law) in mind, and that jurisdiction would probably have the greatest interest in defining the rights of the contracting parties. This doctrine, however nebulous in its statement, seems to fulfill more adequately the expectations of the parties than the definitively worded, but often artificially applied, doctrine of lex loci contractus."); Mulvihill v. Furness, Withy & Co., 136 F.Supp. 201, 206 (S.D.N.Y.1955) (". . . the most salutary resolution of the conflicts problem is to ascertain the forum having the closest connection with the matters raised by the litigation."); Bernkrant v. Fowler, 55 Cal.2d 588, 360 P.2d 906 (1961) (application of Nevada local law to uphold an oral contract to make a will which would be invalid under the statute of frauds of California, the state of the decedent's domicil, based upon the interests of the two states, protection of the justified expectations of the parties, and the relevant contacts); Cochran v. Ellsworth, 126 Cal.App.2d 429, 437, 272 P.2d 904, 909 (1954) ("In this situation the bare physical act of signing the written instrument was a fortuitous, fleeting and relatively insignificant circumstance in the total contractual relationship between the parties. It should not be elevated to paramount importance, particularly when to do so will serve only the purpose of rendering invalid an otherwise legal

agreement."); Graham v. Wilkins, 145 Conn. 34, 138 A.2d 705 (1958) (contract made in Pennsylvania to be performed in various states held governed by Connecticut local law on the ground that it had its "beneficial operation and effect" in Connecticut); Gregg v. Fitzpatrick, 54 Ga.App. 303, 187 S.E. 730 (1936) (contacts enumerated and local law of state in which majority of contacts were grouped applied); W. H. Barber Co. v. Hughes, 223 Ind. 570, 586, 63 N.E.2d 417, 423 (1945) ("The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact."); H I M C Investment Co. v. Sicialiano, 103 N.J.Super. 27, 246 A.2d 502 (1968); Spahr v. P. & H. Supply Co., 223 Ind. 591, 63 N.E.2d 425 (1945); Auten v. Auten, 308 N.Y. 155, 161, 124 N.E.2d 99, 102 (1954) ("Although this 'grouping of contacts' theory may, perhaps, afford less certainty and predictability than the rigid general rules . . . the merit of its approach is that it gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation' . . ..  Moreover, by stressing the significant contacts, it enables the court not only to reflect the relative interests of the several jurisdictions involved . . . but also to give effect to the probable intention of the parties and consideration to 'whether one rule or the other produces the best practical result.'"); Rubin v. Irving Trust Co., 305 N.Y. 288, 113 N.E.2d 424 (1953); Lilienthal v. Kaufman, 239 Or. 1, 395 P.2d 543 (1964); Johnston v. Commercial Travelers Mut. Acc. Ass'n, 242 S.C. 387, 131 S.E.2d 91 (1963); Boston Law Book Co. v. Hathorn, 119 Vt. 416, 423, 127 A.2d 120, 125 (1956) (". . . where the contract contains no explicit provision that it is to be governed by some particular law the courts 'examine all the points of contact which the transaction has with the two or more jurisdictions involved, with the view to determine the "center of gravity" of the contract, or of that aspect of the contract immediately before the court, and when they have identified the jurisdiction with which the matter at hand is predominantly or most intimately concerned, they conclude that this is the proper law of the contract which the parties presumably had in view at the time of contracting.'"); Peterson v. Warren, 31 Wis.2d 547, 143 N.W.2d 560 (1966) (citing §§ 332 and 346 of Tent.Draft No. 6, 1960 and § 599d of Tent.Draft No. 11, 1965); Wojciuk v. United States Rubber Co., 19 Wis.2d 224, 122

N.W.2d 737 (1963) (rights of parties for breach of warranty will be determined by the law of the place "most closely associated with the transaction"); Potlatch No. 1 Federal Credit Union v. Kennedy, _ Wash.2d _, 459 P.2d 32 (1969) (quoting and applying rule of Section); Baffin Land Corp. v. Monticello Motor Inn, Inc., 70 Wash.2d 893, 425 P.2d 623 (1967) (quoting and applying rule as stated in § 332 of Tent.Draft No. 6, 1960); In re Estate of Knippel, 7 Wis.2d 335, 96 N.W.2d 514 (1959).

*Comment b*:  The importance of protecting the justified expectations of the parties in contract choice-of-law cases has been frequently emphasized.  See, e. g., Kossick v. United Fruit Co., 365 U.S. 731, 741 (1961) (". . . we are dealing here with a contract, and therefore with obligations, by hypothesis, voluntarily undertaken. . . .  This fact in itself creates some presumption in favor of applying the law tending toward the validation of the alleged contract."); Pritchard v. Norton, 106 U.S. 124 (1882); Teas v. Kimball, 257 F.2d 817 (5th Cir. 1958); Heede, Inc. v. West India Machinery and Supply Co., 272 F.Supp. 236 (S.D.N.Y.1967); Bernkrant v. Fowler, supra; Ehrenzweig, Contracts in the Conflict of Laws, 59 Colum.L.Rev. 973, 1171 (1959). This policy is of little assistance in situations where the question is whether an individual provision of a contract should be invalidated in order to preserve the principal obligation.  See, e. g., Zogg v. Penn Mutual Life Insurance Co., 276 F.2d 861 (2d Cir. 1960); Auten v. Auten, supra.

The desire of the courts to uphold contracts is demonstrated by the usury cases cited in the Reporter's Note to § 203.

The Uniform Commercial Code provides in § 1-105 that, in the absence of an effective choice of law by the parties, its provisions are applicable to "transactions bearing an appropriate relation to this state."

For a suggestion that where the parties are to perform in different states the obligations of each party under the contract will be determined, at least on occasion, by the local law of the state where he was to perform, see Auten v. Auten, supra.

For a suggested alternative formulation, see Weintraub, Choice of Law in Contract, 54 Iowa L.Rev. 399 (1968).

**Cross Reference**

ALR Annotations:

Validity and effect of stipulation in contract to the effect that it shall be governed by the law of a particular state which is neither the place where the contract is made nor the place where it is to be performed.  112 A.L.R. 124.

Digest System Key Numbers:

Contracts 2, 101, 144, 276, 325

Restatement of the Law, Second, Conflict of Laws

Copyright (c) 1971, The American Law Institute

**End of Document**